Present:  All the Justices

EDWARD NATHANIEL BELL

v.  Record No. 011777  OPINION BY JUSTICE CYNTHIA D. KINSER
                                        JUNE 7, 2002
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF WINCHESTER
Dennis L. Hupp, Judge

A jury convicted Edward Nathaniel Bell of the 1999 capital murder of Sergeant Ricky Lee Timbrook, a law enforcement officer with the Winchester Police Department, when such killing was for the purpose of interfering with the performance of Sergeant Timbrook's official duties.[1]  At the conclusion of the penalty phase of a bifurcated trial, the jury recommended that Bell be sentenced to death on the capital murder conviction, finding that there is a probability that he would commit criminal acts of violence in the future that would constitute a continuing serious threat to society.  See Code § 19.2-264.2.  After reviewing a post-sentence report prepared pursuant to Code § 19.2-264.5, the circuit court sentenced Bell in accordance with the jury verdict.

_____

[1] Bell was also convicted of the use of a firearm in the commission of murder, possession of cocaine with intent to distribute, and possession of a firearm while possessing cocaine.  He was sentenced to imprisonment for terms of 3 years, 10 years, and 5 years, respectively, for these convictions, which are not the subject of this appeal.

Bell now appeals that conviction and his sentence of death. After considering the issues raised by Bell and conducting our mandated review pursuant to Code § 17.1-313(C), we find no error in the judgment of the circuit court and will affirm Bell's conviction of capital murder in violation of Code § 18.2-31(6) and the imposition of the death penalty.

## I. FACTS

We will state the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party before the trial court. Burns v. Commonwealth, 261 Va. 307, 313, 541 S.E.2d 872, 877, cert. denied, ___ U.S. ___, 122 S.Ct. 621 (2001); Jackson v. Commonwealth, 255 Va. 625, 632, 499 S.E.2d 538, 543 (1998), cert. denied, 525 U.S. 1067 (1999); Roach v. Commonwealth, 251 Va. 324, 329, 468 S.E.2d 98, 101, cert. denied, 519 U.S. 951 (1996). In doing so, we accord that evidence all inferences fairly deducible from it. Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).

## A. GUILT PHASE

On the evening of October 29, 1999, Sergeant Timbrook and two probation and parole officers were working together in a program known as Community Oriented Probation and Parole Services. One aspect of Sergeant Timbrook's

2

responsibilities was to assist the probation officers in making home visits to individuals on probation or parole. On that particular evening, these three individuals were patrolling in an unmarked car in Winchester and were, among other things, searching for Gerrad Wiley, who was wanted for violating the terms of his probation.

The officers went to Wiley's residence on Woodstock Lane in Winchester several times that evening to no avail. Just before midnight, when they returned to Wiley's residence for the sixth time, they saw an individual standing in a grassy area between a trash dumpster and an apartment building. As one of the probation officers and Sergeant Timbrook exited the vehicle and approached that individual, who was later identified as Daniel Charles Spitler, another person, who had "dipped behind in the shadows," began running away. Sergeant Timbrook pursued that individual while calling for assistance on his radio.

Spitler identified the individual who ran from Sergeant Timbrook as Bell. Spitler testified that, on the evening in question, he was in the area of Woodstock Lane for the purpose of obtaining cocaine from Wiley. After no one answered his knock on the door of Wiley's residence, Spitler started walking down a nearby alley where he encountered Bell. Spitler did not tell Bell that he wanted

cocaine, but, according to Spitler, Bell "put his hands on [Spitler] like to pat [him] down to check and see if [Spitler] had a wire on [him]."  During that encounter, Sergeant Timbrook and the two probation officers arrived in the unmarked vehicle.

When the vehicle's headlights illuminated Spitler and Bell, Spitler started walking toward the headlights, but Bell stepped into the shadows of a building.  Spitler identified Sergeant Timbrook as one of the individuals who emerged from the vehicle.  According to Spitler, Bell then started running away and Sergeant Timbrook chased after him, yelling "We have one running.  Stop."  Spitler lost sight of Bell and Sergeant Timbrook when they ran behind a building, but Spitler testified that he heard a shot soon thereafter.

Sergeant Timbrook chased Bell along several streets and down an alley between two houses located at 301 and 303 Piccadilly Street.  These houses were separated by a fence approximately two or three feet in height.  As Sergeant Timbrook started to climb over the fence, a shot rang out. A police officer, Robert L. Bower, who had responded to Sergeant Timbrook's radio call for assistance, described the incident in this manner:

4

[A]s [Sergeant Timbrook] started to cross over, I took my eyes off of him, and directed it toward the subject. I noticed it stopped. And, I saw a, what appeared to be a left shoulder as it stopped. All I could was . . . it was like a black material. . . . As soon as I saw it stop, I looked back at [Sergeant] Timbrook to say something, at which time I heard the shot. And, I saw [Sergeant] Timbrook falling.

Sergeant Timbrook's body was found lying on the ground with his feet close to the fence and his upper torso leaning against a wall. His gun was still in its holster. Sergeant Timbrook was transported to a local hospital where he was pronounced dead. The cause of death was a single gunshot wound above his right eye, caused by a bullet which was fired from a distance of between six and eighteen inches.

Brad Triplett, one of the probation officers who had been patrolling with Sergeant Timbrook that evening, ran in a parallel direction during part of Sergeant Timbrook's pursuit of Bell. At one street intersection, he saw Sergeant Timbrook running after the "same dark[ly] dressed figure" who had originally fled from Sergeant Timbrook. Triplett described that person's clothing as a "dark black type of jumpsuit, nylon material," with "reflective like stripes on the jacket." Several times during the pursuit, Triplett heard Sergeant Timbrook yelling, "Stop running. Police." He also heard the gunshot.

The police searched the area for the suspect throughout the night by securing a perimeter around the neighborhood where the shooting had occurred and by using a helicopter equipped with a heat-sensitive "Forward Looking Infrared" camera and a spotlight. At one point during the search, Officer Brian King spotted an individual lying on the back steps of a house located at 305 Piccadilly Street.[2] King stated that the person was wearing a dark colored jacket with reflective strips on the sleeves that "li[t] up like a Christmas [t]ree" when he shined his flashlight on the individual. The person then stood up and disappeared behind a bush.

Emily Marlene Williams, who lived at 305 Piccadilly Street, testified that she heard the gunshot on the evening in question and about five minutes later heard a "crash" in the basement of her house. After she told the police about the noise in her basement, the police evacuated her and her family from their home. The following morning, the police discovered Bell, a Jamaican national, hiding in a coal bin in the basement of the Williams' residence. He was wearing a "LUGZ" black nylon jacket and a black beret cap with a gold pin. The jacket had reflective stripes on the

---

[2] The shooting occurred in the area between 301 and 303 Piccadilly Street.

sleeves.  Spitler identified both of these items of clothing as those that Bell had been wearing on the evening when Sergeant Timbrook was shot.  Before Bell was transported from the Williams' residence to the police department, a gunshot residue test was administered to Bell's hands and the recovered particles were subsequently identified as gunshot primer residue.

During a search of the backyard of the Williams' residence the day after Bell was apprehended, a deputy sheriff found a pearl-handled, Smith and Wesson .38 Special double action revolver.  The gun was located under the edge of a porch on the Williams' house and was covered with leaves and twigs.  Forensic testing established that this handgun fired the bullet that killed Sergeant Timbrook.  Forensic testing of DNA that was recovered by swabbing the grips, butt, trigger, and trigger guard of this revolver could not eliminate Bell as a co-contributor of that DNA, which was consistent with a mixture of DNA from at least three individuals.

When questioned by the police after his arrest, Bell admitted that he had been on Woodstock Lane when "a white guy" allegedly began bothering him for information.  Bell said that when a car drove up and a man got out of the car, he "was scared" and ran.  He said he did not know who was

chasing him or why, and that when he heard a shot fired, he hid in the basement of the house where he was later discovered. Bell denied having a gun. However, while Bell was confined in jail awaiting trial, he told another inmate that he shot Sergeant Timbrook, threw the gun underneath a porch, and then broke into a house and changed clothes in the basement.

Justin William Jones testified that, around nine o'clock on the evening of the shooting, he saw Bell in the vicinity of Piccadilly Street. According to Jones, Bell showed him a revolver and asked if Jones knew of anyone who wanted to buy a weapon. Jones identified the pearl-handled, .38 caliber revolver introduced at trial as the same weapon that Bell had shown him.

The evening Sergeant Timbrook was shot was not the first encounter between Timbrook and Bell. Sergeant Timbrook had arrested Bell for carrying a concealed weapon in May 1997. The following year, in September 1998, Sergeant Timbrook was present during the execution of an Immigration and Naturalization Service order to detain Bell. Eight months later, Sergeant Timbrook assisted in executing a search warrant at Bell's home. Bell was present during that search. In the summer of 1999, one of Bell's friends heard Bell state, as Sergeant Timbrook drove

8

by in a vehicle, "Somebody needs to bust a cap in his ass."
Another of Bell's acquaintances testified that she heard
Bell say that he would like to see Sergeant Timbrook dead,
and that if he ever came face to face with Sergeant
Timbrook, he would shoot Sergeant Timbrook in the head
because he knew that Sergeant Timbrook wore a bullet-proof
vest.

### B. PENALTY PHASE

During the penalty phase, the Commonwealth presented
evidence regarding Bell's criminal history.  Several law
enforcement officers testified about incidents involving
Bell.  A police officer from Jamaica provided information
about Bell's commission of the crimes of assault and
destruction of property in 1985.  In 1997, an officer with
the Winchester Police Department found a .38 caliber
handgun concealed in the trunk of a car being driven by
Bell.  The serial number of the gun had been filed off.  An
officer with the West Virginia State Police stated that
when he stopped Bell for speeding in 1999, Bell gave him a
false name.  When the officer started to arrest Bell and
place him in handcuffs, Bell ran away into a cornfield.
Another West Virginia law enforcement officer found five
.38 caliber rounds of ammunition on Bell's person during a
"stop and frisk" in 1999.  Finally, two employees of the

jail where Bell was confined while awaiting trial testified that Bell had threatened them.

Another witness, Billy Jo Swartz, testified about an incident in 1997 when Bell grabbed her head and slammed it into his car.  He also held a gun to her head.  During the same incident, Bell got into a fight with his pregnant girlfriend and knocked her to the ground.  Swartz further stated that she had seen Bell with illegal drugs.  Other witnesses likewise testified about buying illegal drugs from Bell.

Members of Sergeant Timbrook's family described their relationship with him and the effect that his death has had on the family.  His wife was pregnant with their first child when Sergeant Timbrook was killed.  The only evidence that Bell introduced during the penalty phase was from his sister and father.[3]

## II. ANALYSIS

### A. ASSIGNMENTS OF ERROR WAIVED

Bell assigned 28 errors on appeal, which he has reduced to 16 questions presented.  However, he failed to brief several assignments of error.  Thus, those alleged

---

[3] We will summarize additional facts and material proceedings when necessary to address specific issues.

errors are waived, and we will not consider them on appeal.[4]

Kasi v. Commonwealth, 256 Va. 407, 413, 508 S.E.2d 57, 60 (1998), cert. denied, 527 U.S. 1038 (1999).

## B. PRETRIAL AND GUILT PHASE ISSUES

### 1. SPEEDY TRIAL

---

[4] Bell failed to brief the following assignments of error, as numbered in his opening brief:

No. 1: trial court erred by refusing to move Bell's trial to a different county;

No. 2: trial court erred by refusing to permit Bell to request expert assistance ex parte while failing to require the Commonwealth to provide notice of the expert assistance it was seeking;

No. 3: trial court erred by denying Bell's request for an expert to investigate his possible brain damage;

No. 5: trial court erred by denying a Bill of Particulars as to the Commonwealth's basis for alleging that Bell would be a continuing threat to society and for the purpose of challenging the constitutionality of the Commonwealth's capital murder statutes;

No. 8: trial court erred by refusing to exclude evidence of gunshot residue found on Bell's hands;

No. 13: trial court erred by refusing to allow Bell to question prospective jurors concerning their views about race;

No. 16: trial court erred by refusing to give Bell additional peremptory challenges during jury selection;

No. 21: trial court erred when it struck juror Haines for cause;

No. 24: trial court erred by permitting the Commonwealth to introduce evidence that was relevant only to Bell's future dangerousness in the community at large;

No. 25: that portion of this assignment of error in which Bell claims that the trial court erred by failing to ensure that the jury was adequately instructed at the penalty phase of his trial; and

No. 27: trial court erred by refusing to permit Bell to question individuals providing victim impact evidence at the sentencing proceeding.

Bell claims that his statutory and constitutional rights to a speedy trial were violated. He was held in custody continuously from October 30, 1999, the date of his arrest, until his trial commenced on January 16, 2001. During that time, two delays occurred that Bell asserts should not be attributed to him in determining whether his speedy trial rights were violated. We do not agree.

On December 20, 1999, the City of Winchester General District Court found probable cause and certified Bell's capital murder charge to a grand jury. The grand jury subsequently indicted Bell for the capital murder of Sergeant Timbrook. During a hearing on February 18, 2000, Bell and his counsel agreed to a trial date of May 30, 2000 and waived Bell's right to a speedy trial. Bell acknowledges on brief that the period between February 18, 2000, and May 30, 2000, should not be included in any speedy trial calculation.

The first delay that Bell claims should not be attributed to him occurred when one of his trial attorneys moved for leave to withdraw as counsel for Bell. Bell's remaining counsel asked for a continuance of the trial date. At a hearing on May 22, 2000, the circuit court granted the motions, appointed an attorney to replace the one withdrawing from Bell's defense team, and continued the

trial to September 11, 2000.  As reflected in the colloquy between the court and Bell at that hearing and in the court's written order, the court explained to Bell that the continuance was based on his motion and that, therefore, the additional time until his new trial date would be excluded from the calculation regarding whether he was tried within the time frame required by Code § 19.2-243. Bell indicated that he understood and agreed that the continuance granted at his request constituted a waiver of his right to a speedy trial.

Bell now argues that the withdrawal of one of his trial counsel forced him to choose between waiving his speedy trial rights or proceeding to trial with only one attorney.  However, the record unequivocally reflects that Bell expressly asked for the continuance resulting in the first delay.  Thus, the time attributable to that continuance is subtracted from the total time that elapsed from the finding of probable cause and the commencement of his trial.  See Code § 19.2-243; Johnson v. Commonwealth, 259 Va. 654, 669, 529 S.E.2d 769, 777, cert. denied, 531 U.S. 981 (2000).

The second delay about which Bell complains involves his request for an independent expert to examine the DNA evidence.  At the time that he moved for appointment of the

13

expert, Bell also asked for a continuance of the trial date in order for his expert to have sufficient time to conduct tests. There had been a delay in receiving the results of the Commonwealth's DNA testing. In an order dated August 17, 2000, the circuit court approved the appointment of an independent expert to examine the DNA evidence on behalf of the defendant and granted the motion for a continuance. Over the defendant's objection, the court attributed this second delay to Bell for purposes of determining his speedy trial rights. The court reasoned that, because the Commonwealth's DNA test results were inconclusive, Bell's request for additional testing was a matter of trial tactics and that, therefore, Bell's decision on how to proceed prompted the delay. Bell's trial was then set for January 16, 2001.

We agree with the circuit court's conclusion that the second delay was attributable to Bell. As the court noted, Bell chose to ask for another continuance in order to obtain additional testing of the DNA evidence after learning that the results of the Commonwealth's testing showed that the DNA profile was consistent with a mixture of DNA of at least three individuals. His alternative course at that juncture would have been to proceed to trial in September and attempt to use the Commonwealth's evidence

14

to exculpate himself.  Having made a decision involving trial strategy that necessitated another continuance, Bell cannot now complain about that delay or attribute it to the Commonwealth.

Upon excluding the time attributable to both continuances at issue when calculating Bell's speedy trial rights under Code § 19.2-243, we conclude that Bell's trial commenced within the five-month period required by that statute.  Thus, Bell's statutory right to a speedy trial was not violated.

Bell also asserts an infringement of his Sixth Amendment right to a speedy trial.  Some of the factors to assess in determining whether a defendant's constitutional right to a speedy trial has been violated are the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Barker v. Wingo, 407 U.S. 514, 530 (1972); accord Fowlkes v. Commonwealth, 218 Va. 763, 766, 240 S.E.2d 662, 664 (1978).  Upon considering these factors, we find no violation of Bell's right to a speedy trial under the Sixth Amendment.  We have already addressed the reasons for the disputed delays and concluded that those delays were attributable to or acquiesced in by Bell.  Furthermore, he has not demonstrated in this record any prejudice resulting

from those delays.  Thus, the circuit court did not err in denying Bell's motion to dismiss the indictment for the alleged violation of his speedy trial rights.

## 2. VIENNA CONVENTION

Before his trial, Bell filed a motion to suppress evidence and to dismiss the indictment because of an alleged violation of his rights under Article 36 of the Vienna Convention on Consular Relations (Vienna Convention), Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820.  After hearing testimony from two police officers, the court denied Bell's motion.  On appeal, Bell asserts that the circuit court erred by refusing to suppress his statement to the police because he made that statement before he was advised of his rights to consular notice and assistance under the Vienna Convention.[5]

James G. Prince, an investigative sergeant with the Winchester Police Department, was one of the two law enforcement officers who transported Bell to the Winchester Police Department after he was apprehended in the basement of the Williams' home.  Soon after their arrival at the police department, Bell told Prince that he was born in

---

[5] In contrast to his original motion, Bell does not assert on appeal that the circuit court erred in refusing to dismiss the indictment.  See Rule 5:17(c).

16

Jamaica and had been in the United States for approximately seven years.  The other police officer present with Prince then read Bell his Miranda rights, after which Bell answered questions for approximately 30 minutes.[6]  Shortly after the questioning ended, Prince advised Bell that, because he was a Jamaican national, his consulate would be advised of his arrest.  According to Prince, Bell immediately stated that he did not want anyone to contact the Jamaican consulate.  Prince explained to Bell that it was a "mandatory notification."

On October 31, 1999, at 10:16 P.M. and 10:21 P.M., David Sobonya, a captain with the Winchester Police Department, faxed a notification to the Consulate of Jamaica in Washington, D.C., advising that Bell had been arrested by the Winchester Police Department.  Sobonya indicated that he was not aware of any response by the Consulate of Jamaica to the faxed notifications.  When asked why there had been a 36-hour delay in making this notification, Sobonya candidly admitted that it was just an oversight.  He also acknowledged that he, Prince, and the other police officer who questioned Bell had attended

---

[6] Bell's statement was recorded on audio-tape and played for the jury at trial.  A transcript of the tape recording was introduced into evidence.

training regarding law enforcement's responsibilities as to foreign nationals who are arrested in this country.

Bell now argues that his rights under the Vienna Convention were violated in three respects: (1) he was not advised of his right to communicate with his consulate, (2) he was not advised of the police department's obligation to notify his consulate until after he made his statement to the police, and (3) there was an inordinate delay in notifying his consulate that he had been arrested. Relying on the decision of the International Court of Justice (ICJ) in the LaGrand Case (F.R.G. v. U.S.), 2001 I.C.J. 104 (June 27), he posits that Article 36 of the Vienna Convention creates an individual right to consular notification and access, that a showing of prejudice is not necessary to establish a violation of that article, and that the LaGrand court decided the question of appropriate remedies when a violation occurs. Bell also asserts that this Court is "bound" to apply the ICJ's decision in LaGrand and that the only remedy that would vindicate the violation of his rights under Article 36 is a new trial in which his statement to the police is suppressed. We do not agree with Bell's position and hold that the circuit court did not err in denying the motion to suppress Bell's statement.

First, we conclude that any rights that Bell has under Article 36 of the Vienna Convention were not violated. That article provides in subsection (1)(b) that "competent authorities . . . shall, without delay, inform the consular post of the sending State" when one of its nationals is arrested or detained pending trial, and shall also "inform the person concerned without delay of his rights under this sub-paragraph."  The record in this case demonstrates that the Winchester Police Department complied with the requirements of this subsection.  Prince advised Bell that the Consulate of Jamaica would be notified of Bell's arrest and that notification, in fact, occurred within approximately 36 hours after Bell was taken into custody.

The provisions of Article 36 do not mandate immediate notification, nor do they necessarily require consular notification before an arrestee is advised of Miranda rights and agrees to waive those rights by answering questions.  Instead, Article 36 simply requires that the notification be made "without delay."  Thus, we conclude that the lapse of 36 hours was not unreasonable.  Cf. County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991) (probable cause finding within 48 hours of warrantless arrest generally satisfies requirement that judicial officer make probable cause determination promptly).

Notably, the delay in the LaGrand case that prompted the ICJ to find that the United States had breached its obligations under Article 36 to the LaGrand brothers and to the Federal Republic of Germany was more than 16 years. In fact, the United States did not notify the LaGrand brothers of their right to consular access until after the completion of proceedings for post-conviction relief. Given the fact that Bell objected to any notification being sent to his consulate, we likewise find no violation of Article 36 arising from the fact that Prince did not expressly advise Bell of any rights he may have under this article.

Second, we conclude that the ICJ, contrary to Bell's assertion, did not hold that Article 36 of the Vienna Convention creates legally enforceable individual rights that a defendant may assert in a state criminal proceeding to reverse a conviction. Instead, the ICJ stated that "Article 36, paragraph 1, creates individual rights, which, by virtue of Article I of the Optional Protocol, may be invoked in [the ICJ] by the national State of the detained person." LaGrand Case (F.R.G v. U.S.), 2001 I.C.J. 104, ___ (June 27) (emphasis added). The ICJ also held that if the United States should fail in its obligation under Article 36, then the United States should allow review of

the conviction and sentence by taking into account the violation of the rights set forth in the Vienna Convention. However, the ICJ recognized that the "obligation can be carried out in various ways" and that "[t]he choice of means must be left to the United States." LaGrand Case (F.R.G. v. U.S.), 2001 I.C.J. 104, ___ (June 27).

This acknowledgement by the ICJ reflects the fact that, in the absence of a clear statement to the contrary, procedural rules of a forum State govern the implementation of a treaty in that State. Breard v. Greene, 523 U.S. 371, 375 (1998) (citing Sun Oil Co. v. Wortman, 486 U.S. 717, 723 (1988); Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 700 (1988); Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for Southern Dist. of Iowa, 482 U.S. 522, 539 (1987)). This principle is also evident in the provisions of Article 36(2). That subsection provides that "[t]he rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State," provided that those "laws and regulations . . . enable full effect to be given to the purposes for which the rights accorded under this Article are intended."

In criminal proceedings in the receiving State, i.e., the United States, a harmless error analysis is routinely

used when deciding whether to suppress a defendant's statement made as a result of a violation of the Fifth Amendment right against self-incrimination.  See, e.g., Milton v. Wainwright, 407 U.S. 371, 372 (1972); United States v. Ping, 555 F.2d 1069, 1077 (2d Cir. 1977); Harryman v. Estelle, 616 F.2d 870, 875 (5th Cir.), cert. denied, 449 U.S. 860 (1980); United States v. Carter, 804 F.2d 487, 489 (8th Cir. 1986); United States v. Lemon, 550 F.2d 467, 471 (9th Cir. 1977).  The same analysis should apply when a defendant seeks to suppress a statement because of an alleged violation of rights conferred pursuant to Article 36 of the Vienna Convention.  Thus, in the present case, even if Bell's rights under Article 36 were violated because the police questioned him prior to advising him of his rights to consular notice and access, we conclude that any such error was harmless.  The evidence of Bell's guilt, as already summarized in this opinion, is overwhelming.  Furthermore, Bell has not alleged, much less demonstrated, any prejudice resulting from the fact that approximately 36 hours elapsed before his consulate was notified of his arrest, nor has he asserted that he would not have answered the police officers' questions if he had first been advised of his right to communicate with his

consulate. Bell, after all, objected to his consulate receiving notice of his arrest.

Finally, even if Article 36 creates legally enforceable individual rights, it does not provide – explicitly or otherwise – that a violation of those rights should be remedied by suppression of evidence. See United States v. Li, 206 F.3d 56, 61 (1st Cir.) (en banc), cert. denied, 531 U.S. 956 (2000); United States v. Chaparro-Alcantara, 37 F. Supp. 2d 1122, 1125-26 (C.D. Ill. 1999), aff'd, 226 F.3d 616 (7th Cir.), cert. denied, 531 U.S. 1026 (2000). Such a remedy is generally not available when a fundamental right is not implicated. Id. The language of Article 36 does not create a fundamental right comparable to the privilege against self-incrimination. Id. Thus, Bell's claim that the alleged violation of his rights under Article 36 should be remedied by suppressing his statement to the police finds no support in the provisions of the Vienna Convention.

### 3. SEARCH OF VEHICLE

On November 11, 1999, Arthur Edward Clarke advised the Winchester Police Department that he had seen Bell exiting a 1997 Chevrolet Cavalier automobile on the morning before Sergeant Timbrook was shot. Clarke stated that Bell got out of the car, walked behind an apartment building located

23

on Woodstock Lane, and proceeded down an alley. Bell did not live at that apartment complex. When Clarke called the police in November, the vehicle was still parked at the same apartment building, which was managed by Clarke. Clarke connected Bell with the vehicle and the shooting of Sergeant Timbrook after another tenant told Clarke that Bell's girlfriend had tried to break into the vehicle.

While arranging to have the vehicle towed to the police department, the police learned that the vehicle was not registered to Bell. At about the same time, the police also received information from a finance company holding a lien on the automobile's title that the vehicle had been stolen from an "Impound Lot" in Front Royal and needed to be taken to the police department so the lienholder's repossession agent could pick up the vehicle. The lienholder subsequently gave the Winchester Police Department permission to search the automobile. Using keys found in Bell's possessions when he was arrested, the police gained access to the vehicle and, while searching it, found three .38 caliber Federal Hydra-Shok bullets in a black nylon cartridge case. The bullets were similar to the one that killed Sergeant Timbrook.[7]

---

[7] A search of Bell's home uncovered an empty box of the same brand and caliber cartridges.

The owner of the vehicle, Michael Carter Johnson, testified that he never gave Bell permission to drive his automobile.  However, Johnson acknowledged that the vehicle had been impounded and that his girlfriend had retrieved the vehicle from the impoundment lot.  The girlfriend admitted that she loaned Bell the automobile on two occasions.  The first time, Bell returned the vehicle, but he did not do so the second time, despite her repeated requests.

Bell moved to suppress the introduction of the evidence seized during the search of the vehicle.  The circuit court denied the motion, finding that Bell lacked standing to object to the search of the automobile.  On appeal, Bell argues that he had a reasonable expectation of privacy in the vehicle because he had been driving it, had the keys in his possession, and had parked it in a private parking lot, leaving it locked with his belongings inside. We do not agree.

Bell bore the burden of proving that he had a legitimate expectation of privacy in the vehicle so as to confer standing to challenge the search.  Barnes v. Commonwealth, 234 Va. 130, 135, 360 S.E.2d 196, 200 (1987), cert. denied, 484 U.S. 1036 (1988).  He did not carry that burden.  Bell did not own the vehicle, and he did not

25

establish that he was authorized to have the car in his possession when it was searched.  See United States v. Wellons, 32 F.3d 117, 119 (4th Cir. 1994) (unauthorized driver of rental car had no legitimate expectation of privacy in the vehicle), cert. denied, 513 U.S. 1157 (1995); United States v. Hargrove, 647 F.2d 411, 413 (4th Cir. 1981) ("person who cannot assert a legitimate claim to a vehicle cannot reasonably expect that the vehicle is a private repository for his personal effects").  Bell had left the vehicle parked at an apartment building where he did not live.  At the time of the search, the lienholder was in the process of repossessing the vehicle and gave the police consent to conduct the search.  Thus, we conclude that the circuit court correctly denied Bell's motion to suppress.  He lacked the requisite standing to challenge the search of the vehicle.

## 4. GRAND JURY

Bell contends that the circuit court erred by refusing to dismiss the indictment because the grand jury was exposed to prejudicial information.  On the day that the grand jury indicted Bell, flyers containing information about Sergeant Timbrook's death, his family, and a scholarship fund for his unborn child were posted on some of the doors to the courthouse.  Bell asserts that the

grand jurors could not have avoided seeing these flyers when they entered the courthouse and were therefore biased against him.

We find no merit in this argument. Bell's contention that the grand jurors were somehow influenced to indict him because of these flyers is pure speculation. The flyers did not even mention Bell. Furthermore, the general district court's finding of probable cause at the preliminary hearing and the petit jury's subsequent guilty verdict demonstrate that there was probable cause to charge Bell and that he was in fact guilty as charged beyond a reasonable doubt. See United States v. Mechanik, 475 U.S. 66, 70 (1986). Thus, we conclude that the circuit court's denial of Bell's motion to dismiss the indictment because of the presence of these flyers in the courthouse was not error.

## 5. JURY SELECTION

Bell contends that the circuit court erred in refusing to strike three jurors for cause. As we have stated on many occasions, a trial court is in the superior position, because that court sees and hears each prospective juror's responses to questions during voir dire, to determine whether a prospective juror would be prevented from or impaired in performing the duties of a juror in accordance

27

with the court's instructions and the juror's oath.  Green
v. Commonwealth, 262 Va. 105, 115-16, 546 S.E.2d 446, 451
(2001) (citing Lovitt v. Commonwealth, 260 Va. 497, 510,
537 S.E.2d 866, 875 (2000), cert. denied, 122 S.Ct. 41
(2001); Vinson v. Commonwealth, 258 Va. 459, 467, 522
S.E.2d 170, 176 (1999), cert. denied, 530 U.S. 1218 (2000);
Stewart v. Commonwealth, 245 Va. 222, 234, 427 S.E.2d 394,
402, cert. denied, 510 U.S. 848 (1993)).  Thus, we give
deference to a trial court's determination whether to
exclude a juror for cause.  262 Va. at 115, 546 S.E.2d at
451.  And, we will not disturb a trial court's refusal to
exclude a juror for cause unless that decision constitutes
manifest error.  Id. at 116, 546 S.E.2d at 451 (citing
Clagett v. Commonwealth, 252 Va. 79, 90, 472 S.E.2d 263,
269 (1996), cert. denied, 519 U.S. 1122 (1997); Roach v.
Commonwealth, 251 Va. 324, 343, 468 S.E.2d 98, 109, cert.
denied, 519 U.S. 951 (1996); Stockton v. Commonwealth, 241
Va. 192, 200, 402 S.E.2d 196, 200, cert. denied, 502 U.S.
902 (1991)).  Guided by these principles, we will examine
each of the jurors about whom Bell complains.

### (a) Juror Golding

Bell assigns error to the circuit court's denial of
his motion to strike juror Golding for cause.  However, the
court later excused this juror because she could not

28

arrange for child care during the trial.  Bell did not object to the court's decision, which moots this assignment of error.[8]

(b) Juror Patton

Bell objected to the seating of juror Patton because, when asked whether he had formed an opinion about the guilt or innocence of Bell, this juror initially answered, "Not sure really.  Kind of do and kind of don't."  After this initial response, juror Patton was asked the following series of questions:

> MR. FISCHEL [Bell's attorney]:  Mr. Patton, you seemed to indicate that you might have formed an opinion about the ultimate question about whether or not Mr. Bell is guilty of this offense from what you learned from the media; is that correct? You are uncertain?
>
> MR. PATTON:  Kind of uncertain.  I mean, I read brief bites of it.  Remember it being in the news a year ago.
>
> MR. FISCHEL:  Let's assume that whatever news source [you] received reported what they got very accurately, do you think that either the City Police or the Prosecutor[']s Office or the Defense, through us, gave them all of the information they have about the case?
>
> MR. PATTON:  I don't guess.
>
> MR. FISCHEL:  Would you think that is unlikely?
>
> MR. PATTON:  I don't know.

---

[8] Apparently, neither Bell nor the Commonwealth realized that juror Golding was excused from the jury panel since they both argued the merits of this assignment of error.

MR. FISCHEL:  If you heard more in this trial than was reported in the papers, could you fairly and impartially assess that information to determine whether or not Mr. Bell is guilty?

MR. PATTON:  I suppose.

MR. FISCHEL:  You do agree, I think you said, that there is a presumption of innocence?

MR. PATTON:  I guess.  I wouldn't be here.

MR. FISCHEL:  That is your purpose?

MR. PATTON:  Right.

MR. FISCHEL:  And, you understand that first there has to be evidence, and then instructions and then a decision?

MR. PATTON:  Right.

THE COURT:  You have heard the Judge ask you and tell you that the fact that [Bell] has been arrested and indicted, that is not evidence?

MR. PATTON:  Right.

MR. FISCHEL:  That is no more powerful than the newspaper articles?

MR. PATTON:  Right.

MR. FISCHEL:  That is the reason we are all here.

MR. PATTON:  Right.

                    *   *   *

MR. FISCHEL:  The point is:  A few moments ago you gave us a maybe, maybe not answer?  But, in analyzing the questions that I just asked you: Can you now tell us more clearly whether you really have formed an opinion about Mr. Bell's guilt or innocence?

[MR.] PATTON:  To be honest with you, about a year ago is when I gave that any thought.  Other than that, I

30

really haven't thought about it. The only way I knew about the case was from the paper. I had an opinion about it, but I don't know all of the circumstances. I can't remember all of the circumstances. To be honest with you, I think I can listen to both sides before I get an opinion. If that is what you are trying to get.

Upon considering juror Patton's voir dire as a whole and not just isolated statements, see Green, 262 Va. at 116, 546 S.E.2d at 451, we conclude that he could sit as a fair and impartial juror. Thus, the circuit court did not abuse its discretion in refusing to strike this juror for cause.

## (c) Juror Estep

The morning after Sergeant Timbrook was shot, juror Estep's mother called him at college, where he was studying criminal justice, and told him about the incident. She also sent him newspaper clippings about it. One of Estep's best friends was a correctional officer and worked where Bell was being detained. In a telephone conversation with his friend, Estep inquired whether his friend had seen Bell. The friend indicated that he had, but Estep and his friend did not discuss Bell or the case any further.

When questioned about the conversation, Estep stated, "It wasn't as if I called him and was picking his brain to see what he knew." Estep acknowledged that his interest in criminal justice "sparked [his] interest" in this case, but

31

he stated that his career goal to work as a law enforcement officer or an insurance company investigator would not affect his ability to sit as a fair and impartial juror. When asked to describe his view of somebody who would commit an offense such as the one at issue, Estep stated, "I wouldn't say madman. You know, just kind of your Hollywood type that you would see in the movies."

In denying Bell's motion to strike juror Estep for cause, the circuit court made the following findings:

> THE COURT: I do think Mr. Estep has given candid and forthright responses. I think this is the type of case which is going to interest any number of people for a lot of reasons. It is a big case, if you want to put it that way. It is the type of thing that citizens who are interested in the affairs of the community would, indeed, be interested in for any number of reasons.
>
> Mr. Estep has particular interest.
>
> And,
>
> that is he is a criminal justice major and I understand why it would be of interest for him. That is the circumstances and the people involved.
>
> He did indicate that he, when he first heard about it he had a preconceived notion of what the defendant would be like. He also readily acknowledged that preconceived notion could be wrong. And, the way I read it, he really didn't give much weight to that preconceived notion at all. I suppose any time you are reading about a set of circumstances of which you are not personally involved, or about people that you do not know, all of us form some sort of notion about what happened or something about the people involved. That can be readily dispelled.

32

That is the way I read Mr. Estep. He acknowledged those things, but he also indicated through his responses, that he understands his responsibilities as a juror and that he can hear the case and decide the case fairly and impartially.

Just because he has particular interest in this field doesn't disqualify him. And,[from] his responses, the question he asks his friend about Mr. Bell was fairly benign and did not go into any details.

So, I don't see how that really prejudices him.

We agree with these conclusions. And, the record supports the court's findings. Thus, the circuit court did not abuse its discretion in refusing to strike juror Estep.

## 6. VOIR DIRE QUESTIONS

In a multifarious argument, Bell asserts that the circuit court erred when it refused to allow Bell to conduct individual voir dire of prospective jurors, denied his motion to prohibit the use of leading questions during voir dire, restricted the questions that Bell's counsel could ask prospective jurors, and used leading questions with regard to matters relevant to prospective jurors' impartiality. We find no merit in any of these assertions.

First, Bell does not have a constitutional right to individual voir dire. Cherrix v. Commonwealth, 257 Va. 292, 300, 513 S.E.2d 642, 647 (citing Stewart, 245 Va. at 229, 427 S.E.2d at 399), cert. denied, 528 U.S. 873 (1999). Here, the circuit court permitted extensive questioning of

33

the prospective jurors with regard to the factors listed in Code § 8.01-358, and those questions were sufficient to preserve Bell's right to a fair and impartial jury.  Thus, the court did not err in refusing to allow individual voir dire.

Bell next contends that the circuit court improperly rehabilitated prospective jurors Battaile, Anderson, Loy, Wood, Janelle, Funkhouser, and Haines.  Initially, we note that juror Loy was excused for cause without objection by Bell, and that Bell did not object to the seating of jurors Battaile, Anderson, Wood, and Funkhouser.  Thus, any claim on appeal regarding those jurors is waived.  See Rule 5:25.

Jurors Janelle and Haines were struck for cause over Bell's objection.  Janelle had stated that she could not impose the death penalty under any circumstances.  Haines had given inconsistent responses to several questions with regard to not only whether she could consider imposing the death penalty but also whether she had formed an opinion about Bell's guilt or innocence.  However, Bell's assignment of error does not challenge the merit of the court's decision to strike these two jurors.[9]  Instead, he

_____

[9] Notably, Bell assigned error to the court's decision to strike juror Haines for cause, but that is one of the assignments of error Bell failed to brief.  See footnote 4, supra.

34

attacks the court's alleged use of leading questions.  But, we do not find any objection by Bell to the court's questions during the voir dire of Janelle and Haines.  See Rule 5:25.  Furthermore, we conclude that the circuit court did not ask improper leading questions of these two jurors. The court, as well as counsel, struggled to ascertain the jurors' positions on certain issues because of their repeated inconsistent answers.

Finally, Bell claims that the court erred by sustaining objections to the following questions:  (1) whether the jurors had any thoughts about what natural life would mean if serving a life sentence or whether there is anything about natural life rather than death that would make it a lighter sentence; (2) whether any juror would be disturbed if Bell decided not to introduce any evidence; (3) whether there are any crimes for which only a death penalty is appropriate; and (4) whether the jurors believed, without any hesitation or doubt, that Bell is presumed to be innocent.  We conclude that the court properly refused to allow Bell to ask these particular questions because they were confusing and called for speculation by the jurors.  See Mueller v. Commonwealth, 244 Va. 386, 400, 422 S.E.2d 380, 389-90 (1992), cert. denied, 507 U.S. 1043 (1993).  Bell had no right to

35

propound any question he wished.  LeVasseur v.

Commonwealth, 225 Va. 564, 581, 304 S.E.2d 644, 653 (1983),

cert. denied, 464 U.S. 1063 (1984).  The circuit court

explained the relevant legal principles, asked appropriate

questions to ensure that the jurors understood those

principles and could apply them to the case, and afforded

Bell a full and fair opportunity to ascertain whether

jurors could "stand indifferent in the cause."  Code

§ 8.01-358.

### 7. RACIAL COMPOSITION OF VENIRE

Bell assigns error to the circuit court's denial of

his motion to strike the jury array and impanel a new

venire.  He claims that, because there were only two Black

individuals in the venire of 50 people, while the Black

population of Winchester is 10.5 percent of the total

population, he was denied his Sixth Amendment right to

select a jury from a representative cross-section of the

community.  The circuit court denied Bell's motion because

he failed to show that there had been a systematic

exclusion of Black members of the community from the

venire.  Instead, the court found that the jury selection

system was random.

Systematic exclusion of a "distinctive group in the

community" must be shown in order to establish that a

36

defendant's constitutional right to a fair jury selection system has been violated.  Watkins v. Commonwealth, 238 Va. 341, 347, 385 S.E.2d 50, 53 (1989) (citing Taylor v. Louisiana, 419 U.S. 522, 538 (1975)), cert. denied, 494 U.S. 1074 (1990).  As the court correctly held, Bell did not establish a systematic exclusion of any distinctive group in the community.  Thus, we conclude that the court did not err in denying Bell's motion.

### 8. EVIDENCE OF OTHER SUSPECTS

Bell's defense theory rested on his claim that three people were involved in the chase during which Sergeant Timbrook was shot:  Bell, Sergeant Timbrook, and an unidentified gunman.  Thus, he proposed to question some of the police officers about other suspects who were investigated by asking what the police were told and what they did as a result of that information.  Bell claimed that he was not offering this testimony for the truth of the assertions but to determine what the police did with the information that they gathered about other potential suspects.  The circuit court refused to allow this type of questioning because it would have elicited responses based on hearsay.

Although Bell did not proffer any testimony but only advised the court as to the nature of the questions he

37

wished to ask, we agree with the circuit court's conclusion that any question requiring a police officer to state what he was told regarding other possible suspects would elicit hearsay. The court, however, advised Bell that he could present evidence about other suspects so long as it was admissible under the rules of evidence, and that he could ask whether blood samples taken from those suspects had been tested. We also note that Bell did establish that Captain Sobonya had received both oral and written information about other suspects. Only when Bell asked Sobonya about the basis for having issued a "look out" for a certain vehicle did the court sustain the Commonwealth's hearsay objection. Thus, we conclude that the circuit court did not err in refusing to allow Bell to elicit hearsay testimony about other suspects from police officers.

9. EVIDENCE OF BELL'S PRIOR POSSESSION OF A FIREARM

Over Bell's objection, the Commonwealth introduced evidence during the guilt phase of the trial that Sergeant Timbrook had arrested Bell in May 1997 for carrying a concealed weapon and that Bell had been convicted of that charge. Bell did not object to admission of the fact that Sergeant Timbrook had previously arrested Bell on a misdemeanor charge and that Bell had been convicted of the

charge, but he objected to the specific charge being identified. The Commonwealth offered this evidence to establish Bell's motive for killing Sergeant Timbrook; namely, that if Sergeant Timbrook had apprehended Bell in possession of the .38 caliber revolver, Sergeant Timbrook could have charged him with a felony because it would have been Bell's second firearms offense, and that such a charge would have adversely affected Bell's pending appeal regarding deportation.[10]

Evidence of other crimes is admissible if it tends to prove any relevant element of the offense charged, such as motive, or the conduct and feeling of the accused toward the victim. See, e.g., Satcher v. Commonwealth, 244 Va. 220, 230, 421 S.E.2d 821, 828 (1992), cert. denied, 507 U.S. 933 (1993). The evidence regarding the concealed weapon charge and conviction was relevant to the Commonwealth's theory of motive and was therefore admissible for that purpose. The circuit court instructed the jury that it could consider the evidence only as

_____

[10] Bell had been convicted for the offense of carrying a concealed weapon in August 1997. Consequently, the Immigration and Naturalization Service commenced administrative proceedings to determine whether Bell could remain in the United States. After several hearings in the immigration court, Bell was scheduled for a removal proceeding on November 5, 1999. That proceeding never took place because he was arrested on the present charge.

evidence of Bell's intent or motive.  Thus, we conclude that the court did not abuse its discretion in admitting this evidence.

10. UNIFORMED LAW ENFORCEMENT OFFICERS IN THE COURTROOM

Bell contends that the circuit court erred by denying his motion to prohibit law enforcement officers from wearing their uniforms when attending the trial as spectators.  The court did not actually deny his motion in full.  Instead, the court ruled that any officer involved in the trial as a witness, bailiff, or security guard could wear a uniform.  The court further held that it would not prevent any officer who was on duty from coming into the courtroom while in uniform.  However, the court recognized that if too many officers attended the trial as spectators while in uniform, it could create "an oppressive atmosphere."  So, the court stated that it would address that situation if and when it occurred.  Apparently, no such problem ever developed because Bell never raised an objection that too many uniformed officers were spectators in the courtroom.  Therefore, we find no error in the court's ruling on this issue.

C. PENALTY PHASE ISSUES

1. APPOINTMENT OF EXPERT TO TESTIFY
REGARDING CONDITIONS OF CONFINEMENT

40

Bell assigns error to the circuit court's denial of his motion for appointment of a correctional specialist as an expert to provide testimony regarding the conditions of confinement under which Bell would be housed if he were sentenced to a term of imprisonment for life.  Bell claims that he needed this expert to review information about Bell, to assess his likelihood of being a future danger in prison, and to testify concerning the correctional systems used in a maximum security prison to manage inmates and prevent acts of violence.

Recognizing that this Court has rejected the relevancy of this type of evidence, see Burns, 261 Va. at 340, 541 S.E.2d at 893; Cherrix, 257 Va. at 310, 513 S.E.2d at 653, Bell, nevertheless, urges this Court to reexamine this issue because, in his view, our rulings are inconsistent with decisions of the United States Supreme Court and because trial courts in Virginia are not consistently following the decisions in Cherrix and Burns.  Bell asserts that evidence concerning the prison conditions in which he would serve a life sentence is relevant not only in mitigation and in rebuttal to the Commonwealth's evidence of future dangerousness, but also to his "future adaptability" to prison life.  A jury, argues Bell, cannot assess a defendant's likelihood of adjusting to life in

41

prison if evidence describing the conditions of confinement is excluded from the jury's consideration.  According to Bell, the "common thread" running through the decisions of the United States Supreme Court in Skipper v. South Carolina, 476 U.S. 1 (1986); Simmons v. South Carolina, 512 U.S. 154 (1994); and Williams v. Taylor, 529 U.S. 362 (2000), is "the Court's recognition that many inmates who would be dangerous if released are not dangerous when confined to the 'structured environment' of prison."

In Skipper, the defendant sought to introduce testimony from two jailers and a "regular visitor" to the jail regarding the defendant's good adjustment during the time he had spent in confinement.  476 U.S. at 3.  The only question before the Supreme Court was "whether the exclusion from the sentencing hearing of the testimony [the defendant] proffered regarding his good behavior during the over seven months he spent in jail awaiting trial deprived [the defendant] of his right to place before the sentencer relevant evidence in mitigation of punishment."  Id. at 4.  In holding that the trial court's exclusion of this evidence impeded the sentencing jury's ability to fulfill its task of considering all relevant evidence concerning the character and record of the defendant, the Court specifically stated that it was not "hold[ing] that all

42

facets of the defendant's ability to adjust to prison life must be treated as relevant and potentially mitigating." Id. at 7 n.2.

The Supreme Court, in Williams, found that the defendant's counsel rendered ineffective assistance, in part, because counsel failed to introduce evidence at sentencing from two prison officials who described the defendant "as among the inmates 'least likely to act in a violent, dangerous or provocative way.' " 529 U.S. at 396. Counsel also failed to introduce evidence at sentencing from two experts who had testified at trial for the prosecution. In their trial testimony, they had opined that there was a "high probability" that the defendant would pose a continuing threat to society. Id. at 368-69. Those experts, however, also surmised that the defendant would not pose a danger to society if kept in a "structured environment," but the defendant's counsel failed to elicit that opinion at sentencing. Id. at 371.

Finally, in Simmons, the issue was whether the Due Process Clause requires a sentencing jury to be informed that a defendant is parole ineligible when that defendant's future dangerousness is at issue. 512 U.S. at 163-64. Reiterating that a "defendant's character, prior criminal history, mental capacity, background, and age are just a

few of the many factors . . . that a jury may consider in fixing appropriate punishment[,]" the Court concluded that "there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that [the defendant] never will be released on parole." Id.

Contrary to Bell's assertion, our decisions in Cherrix and Burns are not inconsistent with these three cases. To use Bell's term, the "common thread" in these cases is that evidence peculiar to a defendant's character, history and background is relevant to the future dangerousness inquiry and should not be excluded from a jury's consideration. This includes evidence relating to a defendant's current adjustment to the conditions of confinement. As the Court stated in Skipper, "a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of . . . character that is by its nature relevant to the sentencing determination." 476 U.S. at 7. But, as we had already stated, "[e]vidence regarding the general nature of prison life in a maximum security facility is not relevant to that inquiry, even when offered in rebuttal to evidence of future dangerousness." Burns, 261 Va. at 340, 541 S.E.2d at 893.

While we do not dispute that Bell's "future adaptability" in terms of his disposition to adjust to

44

prison life is relevant to the future dangerousness inquiry, Bell acknowledged on brief that the individual that he sought to have appointed has been qualified previously as an expert in prison operations and classification. The testimony that Bell sought to introduce through the expert concerned the conditions of prison life and the kind of security features utilized in a maximum security facility. That is the same kind of evidence that we have previously rejected as not relevant to the future dangerousness inquiry. See Burns, 261 Va. at 340, 541 S.E.2d at 893; Cherrix, 257 Va. at 310, 513 S.E.2d at 653. Nor is such general evidence, not specific to Bell, relevant to his "future adaptability" or as a foundation for an expert opinion on that issue. Thus, we conclude that the circuit court did not err in denying Bell's motion. Bell failed to show a "particularized need" for this expert. Lenz v. Commonwealth, 261 Va. 451, 462, 544 S.E.2d 299, 305, cert. denied, ____ U.S. ____, 122 S.Ct. 481 (2001). In light of the inadmissibility of the evidence that Bell sought to introduce through the expert, he also failed to establish how he would be prejudiced by the lack of the expert's assistance. See id.

2. EVIDENCE OF UNADJUDICATED CRIMINAL CONDUCT

Bell contends that the admission of evidence regarding unadjudicated criminal conduct during the penalty phase of his trial violated his rights under the Eighth Amendment and deprived him of life without due process of law. We have previously decided this issue adversely to Bell's position. See, e.g., Lenz, 261 Va. at 459, 544 S.E.2d at 303; Goins v. Commonwealth, 251 Va. 442, 453, 470 S.E.2d 114, 122, cert. denied, 519 U.S. 887 (1996); Williams v. Commonwealth, 248 Va. 528, 536, 450 S.E.2d 365, 371 (1994), cert. denied, 515 U.S. 1161 (1995); Satcher, 244 Va. at 228, 421 S.E.2d at 826; Stockton, 241 Va. at 210, 402 S.E.2d at 206; Watkins, 238 Va. at 352, 385 S.E.2d at 56. Bell presents no compelling reason why we should depart from our prior rulings.

### 3. EVIDENCE REGARDING EXECUTION PROCEDURE

Bell contends that the circuit court's denial of his motion to conduct an evidentiary hearing regarding the Commonwealth's methods of execution violated his rights under the Eighth and Fourteenth Amendments. He also contends that the court erred by refusing to prohibit death penalty proceedings because the imposition of the death penalty as currently applied in Virginia does not comport with evolving standards of decency.

46

We have already ruled that execution of prisoners by electrocution does not violate the Eighth Amendment's prohibition against cruel and unusual punishment. Ramdass v. Commonwealth, 246 Va. 413, 419, 437 S.E.2d 566, 569 (1993), vacated in part on other grounds, 512 U.S. 1217 (1994), cert. denied after remand, 514 U.S. 1085 (1995); Stockton, 241 Va. at 215, 402 S.E.2d at 209-10; Martin v. Commonwealth, 221 Va. 436, 439, 271 S.E.2d 123, 125 (1980); Hart v. Commonwealth, 131 Va. 726, 743-44, 109 S.E. 582, 587 (1921). While this Court has not specifically determined whether execution by lethal injection likewise does not constitute cruel and unusual punishment, the basis of Bell's motion and the affidavit evidence he proffered in support of the motion allege that the Commonwealth's current procedures for administering a lethal injection as a means of execution pose substantial and unwarranted risks of subjecting a prisoner to extreme physical pain and suffering during the execution. This is the same type of allegation that this Court rejected when upholding the constitutionality of death by electrocution. See Martin, 221 Va. at 439, 271 S.E.2d at 125. See also Ramdass, 246 Va. at 419, 437 S.E.2d at 569.[11] Without more, we conclude

_____

[11] One of the affidavits proffered by Bell regarding electrocution was from Dr. Harold Hillman. In a similar

47

that Bell was not entitled to an evidentiary hearing on this issue.  See Dawson v. State, 554 S.E.2d 137, 144 (Ga. 2001) (recognizing lethal injection as reflective of "societal consensus that the 'science of the present day' has provided a less painful, less barbarous means for taking the life of condemned prisoners").

Furthermore, pursuant to the provisions of Code § 53.1-234, Bell has the right to choose whether his execution will be by lethal injection or by electrocution. Because Bell has that choice and we have already ruled that execution by electrocution is permissible under the Eighth Amendment, it would be an unnecessary adjudication of a constitutional issue to decide whether lethal injection violates the Eighth Amendment.  See Bissell v. Commonwealth, 199 Va. 397, 400, 100 S.E.2d 1, 3 (1957).  We decline to do so, and likewise cannot say that the circuit court erred in denying Bell's motion for an evidentiary hearing to decide the constitutionality of lethal injection as a method of execution.  Thus, we find no error in the court's denial of Bell's motion.

---

affidavit submitted in Ramdass, Dr. Hillman stated that execution by lethal injection, if properly performed, is substantially less painful than execution by electrocution. (That particular affidavit was not individually cited in our opinion in Ramdass, but it was included in the joint appendix, pp. 1265-71, filed with the appeal in that case.)

## 4. CONSTITUTIONALITY OF DEATH PENALTY
## AS APPLIED IN VIRGINIA

Bell asserts several reasons why the death penalty is unconstitutional as applied in Virginia.  We have previously rejected his arguments:  (1) future dangerousness predicate is unreliable and vague - rejected in Remington v. Commonwealth, 262 Va. 333, 355, 551 S.E.2d 620, 626 (2001), cert. denied, ____ U.S. ____, 2002 U.S. LEXIS 3356 (May 13, 2002); (2) use of unadjudicated criminal conduct violates requirement of heightened reliability - rejected in Satcher, 244 Va. at 228, 421 S.E.2d at 826; (3) unconstitutional for trial court to use pre-sentence report that contains hearsay evidence - rejected in Cherrix, 257 Va. at 299, 513 S.E.2d at 647; and (4) Virginia's appellate review of death penalty cases violates the Eighth Amendment and the Due Process Clause - rejected in Lenz, 261 Va. at 459, 544 S.E.2d at 304.  Bell has provided no compelling reason why we should depart from these precedents.

## 5. JURY QUESTION REGARDING EARLY RELEASE

In accordance with our decision in Yarbrough v. Commonwealth, 258 Va. 347, 374, 519 S.E.2d 602, 616 (1999), the circuit court instructed the jury that "[t]he words 'imprisonment for life' mean imprisonment for life without

49

possibility of parole." During the penalty phase deliberations, the jury inquired, "Understanding that imprisonment for life means no possibility of parole, is there any other way to be released from prison?" Recognizing that geriatric release is not available to a defendant convicted of capital murder, the court's proposed answer was, "No. Not when the Defendant has been convicted of capital murder."

Bell agreed with this response, but the Commonwealth objected because there could be other ways for a defendant convicted of capital murder to be released early, such as by an act of executive pardon or clemency. To answer the question truthfully would therefore require that the jury be informed about such things, argued the Commonwealth. Concluding that the Commonwealth's position was correct, the court told the jurors that they "would have to rely on the evidence that they heard, and the instructions already presented in deciding the punishment." In the circuit court's view, a truthful answer to the jury's question would have opened the door to matters that were speculative and inappropriate for the jury to consider.

Bell argues that the circuit court erred by not answering the jury's question and instructing that other forms of early release are not available to defendants

convicted of capital murder.  He contends that the question indicated that the jurors were speculating about whether, despite the instruction that life means life without parole, Bell could still receive some form of early release.  He claims that this speculation, which remained unresolved, caused the jury to impose the death penalty instead of life imprisonment.  Thus, Bell argues that his sentence of death was rendered in violation of Virginia law, see Yarbrough, 258 Va. at 373, 519 S.E.2d at 616, his rights under the Due Process Clause of the Fourteenth Amendment, see Simmons, 512 U.S. at 171, and his rights to a fair and reliable sentencing determination under the Eighth Amendment, id. at 172-73 (Souter, J., concurring).

However, Bell acknowledges that the court's proposed response to the jury's question was not accurate.  Even though a defendant convicted of capital murder and sentenced to life imprisonment is not eligible for certain forms of early release, such as geriatric release under Code § 53.1-40.01, an act of executive pardon or clemency is still available for such a defendant.  Bell, nevertheless, argues that the circuit court had a duty to fashion an appropriate response to the jury's question and suggests that such a response would have been that "a life sentence for Bell would permit no parole, no community

51

supervision, no early release program, or any other credits that would reduce the mandatory imprisonment." Recognizing that even this answer does not address the possibility that the jury was concerned about release by an act of executive pardon or clemency, Bell suggests that the court should also have told the jury not to concern itself with anything else.

We agree that, when a principle of law is materially vital to a defendant in a criminal case, a trial court cannot merely refuse a defective instruction, but must correct the instruction and then give it in the proper form. Whaley v. Commonwealth, 214 Va. 353, 355-56, 200 S.E.2d 556, 558 (1973), cited in Fishback v. Commonwealth, 260 Va. 104, 117, 532 S.E.2d 629, 635 (2000). The issue in this case is not whether the circuit court failed to correct a defective instruction. Instead, we must decide whether the court's answer to the jury's question was, in fact, defective. Stated differently, the issue is how the jury's question in this case should have been answered "so that [the jury could be] properly informed and [could] render a fair trial to both parties while preserving . . . the separation of" the judicial branch's function of assessing punishment and the executive branch's function of

administering the punishment.  Fishback, 260 Va. at 113-14, 532 S.E.2d at 633.

To address this issue and the response that Bell now puts forward as a proper answer to the jury's question, we must first examine our decision in Fishback.  There, the question was whether a defendant convicted of a non-capital felony was entitled to have the jury instructed that parole has been abolished in Virginia for offenses committed after January 1, 1995.  260 Va. at 108, 532 S.E.2d at 630.  We answered that question affirmatively.  Id. at 115, 532 S.E.2d at 634.  In addition, we also concluded that, "because Code § 53.1-40.01 is in the nature of a parole statute, where applicable juries shall also be instructed on the possibility of geriatric release pursuant to that statute."  Id. at 115-16, 532 S.E.2d at 634.

To clarify our new rule, we further stated that

the task of the trial courts will require only that instructions with regard to the abolition of parole be tailored to the facts of a particular case.  Thus, when a defendant's age and the permissible range of punishment for the offense in question totally negate the applicability of Code § 53.1-40.01, the jury will be instructed that the defendant is not eligible for parole in accordance with Code § 53.1-165.1.  In those cases where geriatric release is a possibility, then the jury will be instructed in accordance with the applicable provisions of Code § 53.1-40.01 along with the instruction that parole is otherwise abolished.

Id. at 116, 532 S.E.2d at 634. Implicit in this holding is the recognition that fairness to both the defendant and the Commonwealth requires that jurors be told that, despite the abolition of parole, certain defendants still qualify for geriatric release. But when a defendant does not qualify for geriatric release, the jury need only be informed that the defendant is not eligible for parole.

In the present case, Bell's conviction of capital murder totally negated the possibility of geriatric release under Code § 53.1-40.01. Thus, pursuant to our direction in Fishback, the jury was instructed that Bell was not eligible for parole, i.e., that life means life without the possibility of parole. As we stated in Fishback, geriatric release is in the nature of parole, and thus, when a defendant does not qualify for geriatric release, an instruction that a defendant is not eligible for parole is correct, and nothing more is required in order to have "truth in sentencing." Id. at 113, 532 S.E.2d at 632. Hence, the jury in this case was properly instructed with regard to the abolition of parole, and when it asked whether there is any other way to be released from prison, the court properly referred the jury to its prior instructions.

With regard to the issue of sentencing credits under Code § 53.1-202.2, we recognized in Fishback that a defendant's eligibility for this type of early release remains dependent upon the prisoner's conduct and participation in various programs established by the Department of Corrections, and on the executive branch's subjective assessment of that conduct and participation. Id. at 115, 532 S.E.2d at 634. Thus, a jury could not, without engaging in speculation, factor the possibility of sentencing credits into its determination of an appropriate sentence. Id. at 116, 532 S.E.2d at 634. For that reason, we held that juries are not to be instructed with regard to sentencing credits available under Code § 53.1-202.2. Id.

Unlike the defendant in Fishback, Bell's conviction of capital murder precludes the possibility of his earning sentencing credits. Thus, the reasons underlying our conclusion in Fishback that juries are not to be instructed about sentencing credits do not apply to Bell's situation. However, because the nature of Bell's conviction negates the applicability of Code §§ 53.1-202.2 and -202.3, just as with geriatric release, we conclude that the circuit court's instructions were correct and that, in response to the jury's question, the court again properly referred to its prior instructions.

55

This leaves only the question whether the jury should have been advised about the availability of early release through an act of executive pardon or clemency. Even Bell does not advocate inclusion of that information in responding to the jury's question. Instead, he argues that the circuit court should have instructed the jury that geriatric release and sentencing credits are not available to him and that the jury should not concern itself with anything else. Bell's suggested response highlights the anomaly presented by the jury's question in this case.

If the jury had inquired about a specific form of early release, such as geriatric release, then the court could have answered that question accurately and dispelled any possible speculation by the jury. Here, however, the question was general and could not have been accurately answered without telling the jury about executive clemency or pardon. Yet, we have never allowed a jury to have that information because of the potential for jury speculation resulting in a harsher sentence than would otherwise be warranted. See Yarbrough, 258 Va. at 372, 519 S.E.2d at 615.

So, the only response that would have comported with our precedent was to instruct the jurors that geriatric release and sentencing credits were not available to Bell

and that they should not concern themselves with anything else. Yet, that kind of response would have suggested that there is some other form of early release still available to Bell and would have, in fact, invited the jury to speculate. See Simmons, 512 U.S. at 170 (trial court's admonishment that jury should not consider parole and that parole was not a proper issue for the jury to consider "actually suggested that parole was available but that the jury, for some unstated reason, should be blind to this fact"). Such speculation is "inconsistent with a fair trial both to the defendant and the Commonwealth." Fishback, 260 Va. at 115, 532 S.E.2d at 634.

Given the nature of the jury's question, we conclude that the circuit court did not err when it responded by directing the jury to rely on the evidence that it had heard and the instructions that had been given. Any other answer would either have been inaccurate or have led to further speculation by the jury. The instruction that imprisonment for life means life without the possibility of parole was correct under our holdings in Yarbrough and Fishback. Nothing more was required in this case. Thus, Bell's rights under our case law, the Due Process Clause, and the Eighth Amendment were not violated.

6. STATUTORY REVIEW

57

Pursuant to Code § 17.1-313(C)(1), we are required to determine whether the death sentence in this case was imposed under the influence of passion, prejudice, or other arbitrary factors. Bell asserts only that, because of the circuit court's alleged errors previously argued by him, his sentence of death was based on arbitrary factors. Our review of the record does not disclose any evidence to suggest that the imposition of the death penalty in this case was based on or influenced by any passion, prejudice, or other arbitrary factor. We also do not believe that any of the circuit court's alleged errors, which we have already separately addressed, created an atmosphere of passion or prejudice that influenced the sentencing decision.

We are also required by the provisions of Code § 17.1-313(C)(2) to determine whether Bell's sentence of death is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." In accordance with Code § 17.1-313(E), we have accumulated the records of capital murder cases reviewed by this Court, including not only those cases in which the death penalty was imposed, but also those cases in which the trial court or jury imposed a life sentence and the defendant petitioned this Court for an appeal. See Whitley

58

v. Commonwealth, 223 Va. 66, 81, 286 S.E.2d 162, 171, cert. denied, 459 U.S. 882 (1982). To comply with the statutory directive that we compare this case with "similar cases," we have focused on cases in which a law enforcement officer was killed and that killing was for the purpose of interfering with the performance of official duties, and in which the death penalty was imposed based upon the future dangerousness predicate. Based on our review, we conclude that Bell's sentence of death is not excessive or disproportionate to sentences generally imposed in this Commonwealth for capital murders comparable to Bell's murder of Sergeant Timbrook. While our review encompasses all capital murder cases presented to this Court for review and is not limited to selected cases, see Burns, 261 Va. at 345, 541 S.E.2d at 896-97, we cite the following cases as examples: Royal v. Commonwealth, 250 Va. 110, 458 S.E.2d 575 (1995), cert. denied, 516 U.S. 1097 (1996); Eaton v. Commonwealth, 240 Va. 236, 397 S.E.2d 385 (1990), cert. denied, 502 U.S. 824 (1991); Delong v. Commonwealth, 234 Va. 357, 362 S.E.2d 669 (1987), cert. denied, 485 U.S. 929 (1988); Beaver v. Commonwealth, 232 Va. 521, 352 S.E.2d 342, cert. denied, 483 U.S. 1033 (1987); Evans v. Commonwealth, 228 Va. 468, 323 S.E.2d 114 (1984), cert. denied, 471 U.S. 1025 (1985).

## III. CONCLUSION

For the reasons stated, we find no error in the judgment of the circuit court or in the imposition of the death penalty.  We also perceive no reason to commute the sentence of death in this case.  Thus, we will affirm the judgment of the circuit court.

<u>Affirmed</u>.