# CIRCUIT COURT OF FAIRFAX COUNTY

Commonwealth of Virginia

v.

Lee Boyd Malvo,
a/k/a John Lee Malvo

May 6, 2003

Case No. (Criminal) 102888
Indictment: Capital Murder (2 counts) and
Using a Firearm in the Commission of a Felony

BY JUDGE JANE MARUM ROUSH

This matter came on for a hearing on April 28 and 29, 2003, on the defendant's motion to suppress and the Commonwealth's opposition to that motion. At the conclusion of the hearing, I took the motion under advisement. I have now fully reviewed the briefs, the exhibits, and my notes of the testimony. In addition, I have fully considered the arguments of counsel and the authorities cited. For the reasons stated below, the motion to suppress will be granted in part and denied in part. The motion to suppress will be granted as to that portion of the defendant's statement that was given before he received the *Miranda* warnings. It will be denied as to the remainder of the statement given after the defendant was advised of his *Miranda* rights and he waived those rights and agreed to speak to the police.

*Facts*

The defendant, Lee Boyd Malvo, is charged with two counts of capital murder and one count of using a firearm in the commission of a felony. The alleged offenses arise from the shooting death of Linda Franklin in Fairfax County on October 14, 2002.

Malvo, a citizen of Jamaica, was arrested in Maryland on October 24, 2002. At the time, Malvo was seventeen years old. He turned eighteen on February 18, 2003. Def. Ex. # 1. Malvo and his co-defendant, John Allen Muhammad, were suspects in a series of shootings in Maryland, the District of Columbia, and Virginia that left several people dead, including Linda Franklin.

Upon his arrest, Malvo was held in Maryland pursuant to a federal material witness warrant. The material witness warrant was dismissed on October 29, 2002, after a twenty-count criminal information was filed against Malvo in federal court in Maryland. None of the counts of the criminal information related directly to the shooting of Linda Franklin. *See* Def. Ex. # 6. United States Magistrate Judge James K. Bredar in Baltimore appointed three attorneys and two guardians *ad litem* to represent Malvo. The attorneys were appointed under the Criminal Justice Act, 18 U.S.C. § 3006A(b).

On November 7, 2002, all federal charges pending against Malvo in Maryland were dropped. Def. Ex. # 14. That morning, United States Marshals transported Malvo to the Alexandria Detention Center. Later that day, Malvo was transported to Fairfax County.

24

On November 7, while Malvo was being transferred from federal custody in Maryland to state custody in Virginia, his Maryland defense attorneys were scrambling to learn his whereabouts. They were told that he was no longer in Baltimore, but they were not told where he was. Robert Tucker, one of Malvo's attorneys, faxed a letter to the United States Attorney for the Eastern District of Virginia. In that letter, Tucker advised that:

> We hereby request that no law enforcement officer make any attempt to interrogate our juvenile client unless we are present. In the event that the federal government intends to transfer our client's custody to state or local authorities, we request that you inform such authorities that we also request that [they not] attempt to interrogate our client unless we are present or unless other counsel appointed by the respective state or local jurisdiction is present.

Def. Ex. # 17.

Also on November 7, Magistrate Judge Bredar in Baltimore issued an order applicable to the cases of both Malvo and Muhammad in which he stated:

> Under the Criminal Justice Act Plan for this District, and U.S.C. § 3006A(a)(1)(H), and possibly other provisions, your clients are entitled to your court-ordered representation so long as they are in circumstances where they are "entitled to appointment of counsel under the Sixth Amendment to the Constitution." While certain charging documents may have been dismissed, you may not have had the opportunity to discuss the significance of those dismissals with your clients. Further, to the extent that there are parallel proceedings in state court relating to the same matters that have been the subject of your representation in the federal proceedings, then, until such time as other competent counsel have assumed responsibility for the representation of your clients, you should treat those state matters as "ancillary matters" within the meaning of 18 U.S.C. § 3006A(c) and continue to represent your clients pursuant to this Court's earlier orders.

Def. Ex. # 16.

Detective June Boyle is the lead homicide detective from Fairfax County assigned to Malvo's case. On November 6, 2002, she went before an intake officer at the Juvenile and Domestic Relations District Court of Fairfax County and obtained petitions charging Malvo with capital murder in violation

of Va. Code § 18.2-31(8), capital murder in violation of Va. Code § 18.2-31(13), and use of a firearm in the commission of a felony in violation of Va. Code § 18.2-53.1. Boyle also obtained a detention order. Def. Ex. # 18.

Boyle testified that she first learned in the early afternoon of November 7 that Malvo was going to be released to Fairfax authorities later that same day. Malvo arrived in Fairfax at about 3:30 p.m. Boyle took custody of him, and escorted him to her office in the Criminal Investigations Bureau located in the Massey Building next to the courthouse.

At about 4:00 p.m., Malvo was seated in an interview room. He was handcuffed. Special Agent Brad Garrett of the Federal Bureau of Investigation entered the room. Malvo was asked if he wanted anything to eat or drink. After first declining, Malvo asked for some veggie burgers and some water. He was given a bottle of water. Veggie burgers were not readily available at police headquarters and someone was sent to get some veggie burgers. After the meal was sent for, the following exchange took place:

Boyle: "We want to talk to you."

Malvo: "Do I get to talk to my attorneys?"

Boyle: "Yes."

Malvo: "Because the lawyers told me don't talk until they get here."

Boyle told Malvo that his charges in Maryland had been dropped, that he was in Virginia now, and that he was being charged in Virginia. She told him "We need to get some information from you." Boyle, Garrett, and Malvo then discussed various matters for about an hour. Def. Ex. # 22 and # 23. Boyle described these matters as general background information about Malvo. At about 5:30 p.m., the meal arrived. Malvo's handcuffs were removed. He ate two veggie burgers.

At 5:55 p.m., Boyle felt that the conversation had veered from general discussion about Malvo's background to specific discussion of the shootings. She advised him of his constitutional rights under *Miranda*. She told him he was being charged with homicide. Malvo stated that he understood his rights and that he wanted to talk to Boyle and Garrett without an attorney. Malvo indicated that he had a twelfth grade education, that he was not under the influence of any drugs or alcohol, and that he could read and write English. Malvo signed an "X" to the *Miranda* form. Com. Ex. # 1. Boyle testified that Malvo did not want to sign his name to the warning and consent form because he said it would be "incriminating." (Similarly, he signed the fingerprint card with an "X" when he was booked in Fairfax.)

Boyle testified that she did not advise Malvo that he had a right to have a parent or guardian present. She knew that Malvo's parents were not in the area, and she did not think that any guardian had been appointed for him. (At that time, Malvo's mother was believed to be in the state of Washington and his father was believed to be in Jamaica.) Therefore, Boyle left blank the section of the warning and consent form that said "Juveniles, do you want a parent/guardian here before we interview you?" Com. Ex. # 1.

After Malvo placed his "X" on the warning and consent form, the following exchange took place:

Boyle: "Can we talk about the case now?

Malvo: "Yes."

Boyle: "Do you want to talk without a lawyer present?"

Malvo: "Yes."

Boyle: "You mentioned an attorney earlier. Are you saying you want to talk to an attorney before you talk to us about this case?"

Malvo: "No."

Boyle: "Are you saying you want an attorney before you talk to us about this case?"

Malvo: "No."

Boyle: "Are you sure you want to talk to us without an attorney present?"

Malvo: "Yes. If I don't want to answer, I won't."

Def. Ex. # 22 and # 23.

Boyle testified that neither she nor Garrett made any threats or promises to Malvo. No appeals were made to his emotions. At no time did Malvo request a parent, guardian, or lawyer.

Malvo had prior experience with *Miranda* warnings. He was arrested for shoplifting in February 2002 in Tacoma, Washington, and was read the *Miranda* warnings two times. Com. Ex. # 2. On October 24, he was read the *Miranda* warnings by police from Montgomery County, Maryland. Def. Ex. # 24. Magistrate Judge Bredar explained to Malvo his rights during Malvo's

court appearance on the material witness warrant on October 24. Com. Ex. # 3. He was again explained his rights during his initial appearance on the criminal information on October 29. Com. Ex. # 4.

Malvo proceeded to make statements to Boyle and Garrett in which he implicated himself in the some of the sniper shootings, including the shooting of Linda Franklin in Fairfax County. Consistent with Malvo's assertion that he would not answer some questions if he did not want to, Boyle testified that Malvo in fact refused to answer some questions. In response to some questions, for example, Malvo said "You figure it out. I'm not going to tell you." Boyle described Malvo's demeanor during the interrogation as "calm" and "fine." He was "well spoken" and "intelligent." He did not cry, nor did he appear to be intimidated by the police. In describing two of the shootings, Malvo was "laughing."

About midway through the interrogation, the following exchange took place:

Boyle: "Are you a Jamaican citizen?"

Malvo: "Yes."

Boyle: "Do you want me to notify the Jamaican embassy?"

Malvo: "They've already been notified."

Boyle: "Do you want me to contact the embassy?"

Malvo: "No."

At 8:35 p.m., Boyle asked Malvo: "Are you still willing to talk to us?" Malvo indicated that he was willing to continue speaking with the police. The interrogation lasted until about 10:40 p.m.

Boyle testified that, while she was interviewing Malvo, she knew nothing of Magistrate Judge Bredar's order of November 7. In addition, she was unaware of Tucker's letter to the United States Attorney for the Eastern District of Virginia. She also did not know that the juvenile court appointed Todd Petit as Malvo's guardian *ad litem* earlier that afternoon.

Petit testified that he received a telephone call from the clerk's office of the juvenile court between 3:00 and 3:30 p.m. on November 7. The clerk told him that Malvo was coming to Fairfax. The clerk asked him if he would be interested in accepting an appointment as Malvo's guardian *ad litem.* Although the order appointing Petit as Malvo's guardian *ad litem* was not

entered until November 8, Petit immediately began preparing for a detention hearing that he expected would occur on November 8.[1]

At 5:30 p.m. on November 7, Petit received a telephone call from a colleague who told him that Malvo was at the Massey Building being interviewed by the police. Petit went immediately to the Massey Building. He arrived at about 6:00 p.m. He entered the ground floor of the Massey Building where he encountered five or six police officers. He said that he was Malvo's guardian and that he wanted all questioning to stop. Five or ten minutes later, Major Lomonaco joined them. Petit repeated his demand that all questioning of Malvo stop. Lomonaco said that he was not part of the interrogation but he would get Petit's message to those in the Criminal Investigations Bureau who were questioning Malvo when he saw them. Petit asked, "When will that be?" Lomonaco responded, "When I get to it." Petit was told to leave the building.

Petit then went to the Commonwealth Attorney's office. He arrived between 6:15 and 6:30 p.m. He demanded to see Commonwealth's Attorney Horan or Deputy Commonwealth's Attorney Morrogh. He stated that he was Malvo's guardian and that he wanted all questioning of his ward to stop. Petit was told that Horan and Morrogh were in a meeting and were not available to talk to him. Petit was told to leave the Commonwealth Attorney's office.

Malvo was brought before a judge of the juvenile court at 1:30 p.m. on November 8. At that time, counsel was appointed and Petit was formally appointed Malvo's guardian ad litem.

## Defendant's Motion to Suppress

Malvo has moved to suppress any statements made by him during the November 7 interrogation. He contends that the interrogation violated his right to counsel guaranteed by the Fifth and Sixth Amendments and his right to be free from compulsory self-incrimination guaranteed by the Fifth Amendment. Malvo claims his statements were not voluntary and thus their admission in evidence would violate his right to Due Process as guaranteed by the Fifth Amendment. In addition, he maintains that his statements should be suppressed because his rights under the Vienna Convention on Consular Relations were violated. I will consider each of these arguments in order.

---

[1] Malvo contends that Petit was his guardian *ad litem* on November 7. The Commonwealth maintains that Petit was not Malvo's guardian *ad litem* until the order of appointment was signed on November 8. For the purposes of this motion, I will assume that Petit was Malvo's duly appointed guardian on November 7.

A. *Sixth Amendment*

Malvo contends that his interrogation violated his Sixth Amendment right to counsel. He asserts that his right to counsel attached without any request by him for counsel because "adversary judicial criminal proceedings" against him had commenced on November 6 when Boyle obtained the juvenile petitions charging him with the shooting of Linda Franklin.

The Commonwealth disputes that "adversary judicial criminal proceedings" had begun when Boyle and Garrett interrogated Malvo on November 7. The Commonwealth argues that adversary judicial criminal proceedings did not commence against Malvo for the shooting death of Linda Franklin until at or after the first formal charging proceeding.

The Sixth Amendment right to counsel attaches after "judicial proceedings have been initiated against" the accused, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Brewer v. Williams*, 430 U.S. 387 (1977). The point at which the Sixth Amendment right to counsel attaches is often a question of state law, depending on at what point under state law formal charges are initiated.

When Malvo was interrogated on November 7, he had been charged pursuant to juvenile petitions but he had not yet been arraigned on those charges. There is no Virginia case deciding whether a petition obtained pursuant to Va. Code Ann. § 16.1-260 charging a juvenile with a delinquent act is the equivalent of an indictment for the purposes determining whether the Sixth Amendment right to counsel has attached. *See, e.g., Lafon v. Commonwealth*, 17 Va. App. 411, 438 S.E.2d 279 (1993) (no right to counsel during pre-arrest investigation); *Hunter v. Commonwealth*, 3 Va. App. 221, 349 S.E.2d 154 (1986) (no right to counsel at pre-indictment lineup); *Kelly v. Commonwealth*, 8 Va. App. 359, 382 S.E.2d 270 (1989) (right to counsel after arrest and arraignment).

The Commonwealth relies on *Eaton v. Commonwealth*, 240 Va. 236, 397 S.E.2d 385 (1990), in support of its position that Malvo's Sixth Amendment right to counsel had not attached at the time of his interrogation. In that case, Eaton went on a multi-jurisdictional crime spree that began when he shot and killed two men in separate incidents in Shenandoah County. He next shot and killed Virginia State Trooper Hines in Rockbridge County. He later killed his girlfriend in the City of Salem. Eaton had been charged with burglary and larceny in Rockingham County and had counsel on those charges. While incarcerated in the Roanoke jail for the murder of his girlfriend, Eaton was questioned by police from Salem and Rockingham County. Earlier that day, Eaton's burglary and larceny charges were dropped. The Virginia Supreme Court held that Eaton's statements need not be suppressed in his prosecution

for the trooper's murder. "Eaton's Sixth's Amendment right to counsel had not yet attached with respect to the murder of Trooper Hines because 'adversary judicial proceedings' had not yet been initiated on that charge." 240 Va. at 252.

While *Eaton* appears factually similar to the present case, a close reading shows that it provides little guidance on the precise question of whether the juvenile petitions in this case initiated adversary judicial proceedings against Malvo for the purposes of his Sixth Amendment right to counsel. Eaton, an adult, had not been indicted or otherwise charged with Trooper Hines's murder before his interrogation. In this case, the juvenile petitions charging Malvo with capital murder and use of a firearm had been obtained on November 6, one day before his interrogation.

The Commonwealth also relies on *Grogg v. Commonwealth*, 6 Va. App. 598, 371 S.E.2d 549 (1988). In that case Grogg, a juvenile, was arrested in Florida on an outstanding Virginia warrant charging him with grand larceny. He was held in jail pursuant to a Florida detention petition. He attended an "advisory proceeding" in court the morning after his arrest. A public defender was appointed to represent him. Thereafter, without notice to his public defender and before his extradition hearing, Fairfax police traveled to Florida and interrogated Grogg about a murder in Fairfax. Grogg confessed to the murder. In his subsequent trial for murder, Grogg's statement was admitted into evidence. The Virginia Court of Appeals affirmed Grogg's conviction, holding that Grogg's Sixth Amendment right to counsel had not attached at the time of the interrogation. The *Grogg* court held that, under Florida law, the advisory proceeding was not a "critical stage" and did not "[signal] the initiation of adversary judicial proceedings." Because *Grogg* was decided under Florida law, it is of little assistance in deciding the effect of the juvenile petition in this case on the issue of when Malvo's Sixth Amendment right to counsel attached.

The purpose of the Sixth Amendment right to counsel is to protect "the unaided layman at critical confrontations with his adversary." *Michigan v. Jackson*, 475 U.S. 625, 631 (1986). "Our conclusion that the right to counsel attaches at the initiation of adversary judicial criminal proceedings is far from a mere formalism … it is only at that time that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified." *Id.* The Sixth Amendment right to counsel attaches "after a formal accusation has been made and a person who has previously been just a 'suspect' has become an 'accused' within the meaning of the Sixth Amendment." *Id.* at 632.

The Sixth Amendment right to counsel does not attach simply on the basis of an arrest. *United States v. Gouveia*, 467 U.S. 180 (1984). *See also Von Kahl v. United States*, 242 F.3d 783 (8th Cir. 2001) (filing of a criminal complaint and issuance of an arrest warrant do not constitute the initiation of adverse judicial proceedings). The case law is uniform in holding that the Sixth Amendment right to counsel attaches by the time of arraignment, *Brewer v. Williams*, 430 U.S. 387 (1977), and indictment, *Massiah v. United States*, 377 U.S. 201 (1964).

I conclude, under the facts of this case, that the initiation of formal charges against Malvo related to the shooting of Linda Franklin occurred on November 8 when Malvo made his first court appearance on the charges contained in the juvenile petitions. At that point, the juvenile judge made a probable cause determination, appointed counsel, set the date for the preliminary hearing, and determined that Malvo would continue to be housed in the adult detention center. It was at this point that a formal accusation had been made and Malvo had gone from being a "suspect" to the "accused." It was at this point that the government "committed itself to prosecute." By that point, Virginia law requires that counsel be appointed. Va. Code § 16.1-266(B) (in delinquency cases counsel must be appointed prior to the detention review hearing).

Therefore, Malvo's Sixth Amendment rights were not violated when he was interviewed on November 7 because adversarial judicial criminal proceedings had not yet been initiated against him for the present charges.

Even if Malvo's Sixth Amendment right to counsel had attached at the time of the interview, I find that he knowingly and intentionally waived that right.

In *Patterson v. Illinois*, 487 U.S. 285 (1988), the defendant challenged his post-indictment police interrogation because his Sixth Amendment right to counsel had attached. The United States Supreme Court rejected Patterson's argument that the police were prohibited from initiating questioning of him because his right to counsel had attached. In that case, Patterson never requested counsel. The Supreme Court held that an accused who is not then represented by counsel is free to make the initial election to "go it alone" and answer police questions without the assistance of counsel. As long as the election to "go it alone" was made knowingly and intelligently, the defendant's uncounseled statements need not be suppressed at trial.

When Malvo was given the *Miranda* warnings, he was not represented by counsel on the Fairfax charges. He did not invoke his right to counsel. Thereafter, he waived his right to remain silent and his right to have counsel present during questioning. He was advised at least four more times of his

right to have counsel present during questioning. In each instance, Malvo waived his right and elected to proceed without counsel.

Malvo claims that his waiver of his Sixth Amendment right to counsel was not knowing because Boyle told him only that he was charged with homicide, not capital murder. Com. Ex. # 1. The evidence adduced at the hearing on the motion to suppress shows that Malvo was well aware of the gravity of the offenses with which he was being charged. Def. Ex. # 22 and # 23. As long as the defendant is advised of the general nature of the charges against him, he need not be advised of the range of punishment for those charges before his waiver of his right to counsel is deemed knowing.

I conclude that Malvo is in the same situation as was the accused in *Patterson v. Illinois*. He was "meticulously informed by authorities of his right of counsel and of the consequences of any choice not to exercise that right." His waiver of the right to counsel was voluntary, knowing, and intelligent. 487 U.S. at 300.

Malvo contends that counsel represented him at the time of the November 7 interrogation. He claims that his Maryland counsel continued to represent him pursuant to Magistrate Judge Bredar's November 7 order until Virginia counsel were appointed. He argues that, because he was represented by Maryland counsel and he had previously and repeatedly asserted his right to remain silent and his right to counsel, the police in Fairfax could not initiate any questioning of him. *Edwards v. Arizona*, 451 U.S. 477 (1981).

I conclude that the Maryland lawyers did not represent Malvo on the Fairfax charges at the time of the November 7 interrogation. First, the charges stemming from the shooting of Linda Franklin in Fairfax were not charges contained in the twenty-count criminal information filed against Malvo in federal court in Maryland. The Sixth Amendment is "offense specific," meaning that the Sixth Amendment right to counsel attaches only to the offense charged. It cannot be invoked once for all future prosecutions. Although the Sixth Amendment right attaches to an accused formally charged with an offense, the police may question the suspect about another offense for which adversary judicial criminal proceedings have not commenced. This is so even if the second offense is closely related to the first offense to which the right to counsel has attached. *Texas v. Cobb*, 532 U.S. 162 (2001).

In *Texas v. Cobb*, Cobb was indicted for a residential burglary. He was appointed counsel on the burglary charge and later confessed to that crime. A woman and child who lived in the burglarized house were missing after the burglary. Without informing Cobb's counsel on the burglary charge, the police questioned Cobb about the disappearance of the woman and child. Cobb confessed to murdering both and led police to the location where he had

buried their bodies. The United States Supreme Court held that Cobb's statements were admissible in the prosecution for the two murders. The Sixth Amendment right is "offense specific." Because the murder charges were separate from the burglary charge, the accused's confession to the murders without the presence of his counsel on the burglary charge was admissible.

A second reason why I conclude that the Maryland attorneys no longer represented Malvo at the time of Malvo's interrogation is that the federal charges in Maryland by that time had been dismissed. The Sixth Amendment rights that attached to Malvo's federal charges in Maryland were specific to those charges. When those charges were dismissed, Malvo's Sixth Amendment right to counsel did not travel with him to Virginia and attach to the charges related to the shooting of Linda Franklin. *Eaton v. Commonwealth*, 240 Va. 236, 397 S.E.2d 385 (1990).

Third, I conclude that, however well intentioned, Magistrate Judge Bredar had no authority to appoint counsel for a prosecution in a Virginia state court of crimes not mentioned in the federal criminal information. Magistrate Judge Bredar's powers did not extend beyond Maryland. 28 U.S.C. § 636(a). In addition, none of the three attorneys he appointed is a member of the Virginia bar.

Because Tucker did not represent Malvo on the Virginia charges, his assertion of Malvo's right to counsel and right to remain silent in his letter to the United States Attorney for the Eastern District of Virginia was of no moment.

Malvo asserts that his statement, "Do I get to talk to my attorneys?" was an invocation of his right to counsel that required all police questioning to stop under *Edwards v. Arizona*, 451 U.S. 477 (1981). The Commonwealth maintains that Malvo's question, "Do I get to talk to my attorneys?" was not a clear and unambiguous request for the assistance of counsel.

To invoke the right to counsel, a suspect must articulate his desire to have counsel sufficiently clearly such that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Davis v. United States*, 512 U.S. 452 (1994). In *Davis,* the United States Supreme Court explained that:

> The applicability of the rigid prophylactic rule of *Edwards* requires courts to determine whether the accused *actually invoked* his right to counsel. To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. Invocation of the *Miranda* right to counsel requires at a minimum, some statement that can reasonably be construed to be an expression of

34

the desire for the assistance of an attorney. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking his right to counsel, our precedents do not require the cessation of questioning. . . .

Rather, the suspect must unambiguously request counsel. As we have observed, a statement either is such an assertion of the right to counsel or it is not. Although a suspect need not "speak with the discrimination of an Oxford don," he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require the officers to stop questioning the suspect.

512 U.S. at 458-59 (most internal quotation marks and citations omitted, emphasis in original).

In *Commonwealth v. Redmond*, 264 Va. 321, 568 S.E.2d 695 (2002), the defendant asked, "Can I speak to my lawyer? I can't even talk to lawyer before I make any kinds of comments or anything?" The police responded, "You can do anything you like." The Virginia Supreme Court held that Redmond's statements were not a clear and unambiguous assertion of his right to counsel. "At best, the defendant's questions may be construed as a desire on his part to obtain more information about his *Miranda* rights." 264 Va. at 330.

A review of Virginia case law shows that statements similar to Malvo's statement, "Do I get to talk to my attorneys?" have not been deemed to be clear and unambiguous invocations of the right to counsel. *See Midkiff v. Commonwealth*, 250 Va. 262, 462 S.E.2d 112 (1995) ("I'll be honest with you, I'm scared to say anything without talking to a lawyer" found ambiguous); *Mueller v. Commonwealth*, 244 Va. 386, 422 S.E.2d 380 (1992) ("Do you think I need an attorney here?" not clear assertion of right to counsel); *Eaton v. Commonwealth*, 240 Va. 236, 397 S.E.2d 385 (1990) ("You did say I could have an attorney if I wanted one?" not clear assertion of right to counsel); *Poyner v. Commonwealth*, 229 Va. 401, 329 S.E.2d 815 (1985) ("Didn't you tell me I had the right to an attorney?" not a request for counsel). *But see McDaniel v. Commonwealth*, 30 Va. App. 602, 518 S.E.2d 851 (1999) (en banc) ("I think I would rather have an attorney here to speak for me" is a sufficiently clear invocation of the right to counsel).

I conclude that Malvo's statement, "Do I get to talk to my attorneys?" was not a request for counsel. As with *Redmond* and *Poyner,* it was at best a request for a clarification of his *Miranda* rights. Furthermore, Boyle and Garrett "did all they were required to do when they reaffirmed defendant's right to counsel by answering 'yes' to his questions." *Poyner,* 229 Va. at 410.

Malvo objects to the admission of his statement because he did not have the assistance of Petit, his guardian *ad litem* during the questioning. Petit, although an attorney, was functioning as a guardian *ad litem* at the time of Malvo's interrogation. As such, he stood in the place of Malvo's parents.

There was no obligation on the part of the police to inform Malvo that his guardian *ad litem* wanted to see him. Nor can the voluntariness of Malvo's statements be affected by matters that occurred outside of his presence and about which he had no knowledge. *Moran v. Burbine,* 475 U.S. 412 (1986) (confession voluntary although police did not tell suspect his attorney was trying to contact him).

There is no constitutionally protected right for a juvenile to have a parent, guardian, or other independent interested adult present during questioning. The absence of such assistance to the juvenile is a factor for the court to consider in determining whether a waiver is knowing and voluntary. "The absence of a parent or counsel is 'a circumstance that weighs against the admissibility of the confession'." *Grogg v. Commonwealth,* 6 Va. App. 598, 613, 371 S.E.2d 549 (1988). Nonetheless, a juvenile's confession can be admissible if, despite the absence of a parent or guardian during police questioning, the confession was made voluntarily after a knowing and intelligent waiver of the juvenile's right to remain silent. *Roberts v. Commonwealth,* 18 Va. App. 554, 445 S.E.2d 709 (1994).

Malvo argues that his statements to Boyle and Garrett must be suppressed because he was not brought before a juvenile court judge or intake officer until November 8. He alleges that Va. Code § 16.1-247 was violated and that the appropriate remedy is suppression.

Virginia Code § 16.1-247 provides that a person who takes a juvenile into custody shall:

> [D]uring such hours as the court is open ... with all practicable speed ... [if the child is] not released, bring the child to the judge or intake officer of the court and, in the most expeditious manner practicable, give notice of the action taken, together with a statement of the reasons for taking the child into custody, in writing to the judge or intake officer. . . .

Va. Code § 16.1-247. Malvo presented evidence at the suppression hearing that the juvenile intake office in Fairfax is open until midnight.

The Commonwealth responds that Va. Code § 16.1-247 does not prohibit police officers from interviewing a juvenile suspect before he is brought before a juvenile intake officer or judge for a detention hearing. The statute requires only that the juvenile be brought to a judge or intake officer "with all practicable speed."

In this case, in the evening hours of Thursday, November 7, members of the police department were in contact with a juvenile intake officer who in turn contacted Chief Judge Maxfield of the juvenile court at home. Judge Maxfield ordered that Malvo should be housed in the adult detention center rather than a juvenile facility.[2] A formal hearing was held the next day.

I conclude that Va. Code § 16.1-247 was not violated in this case. Although Malvo did not personally appear before a juvenile intake officer or judge on the night of November 7, Judge Maxfield did review the circumstances and conditions of his detention that evening. Further, Malvo had a formal hearing at 1:30 p.m. on November 8, less than 24 hours after he was released to the custody of the Fairfax police. Under the circumstances, I find that Malvo's detention hearing was held "with all practicable speed."

Even if there were a technical violation of Va. Code § 16.1-247, the statute is "not intended to safeguard a juvenile's Fifth and Sixth Amendment rights." *Roberts v. Commonwealth,* 18 Va. App. 554, 445 S.E.2d 709 (1994). *See also Durrette v. Commonwealth,* 201 Va. 735, 113 S.E.2d 842 (1960) (decided under predecessor statute). The statute sets forth a procedural requirement. "Violation of the requirement reaches a constitutional dimension only if it results in the defendant's loss of exculpatory evidence." *Frye v. Commonwealth,* 231 Va. 370, 345 S.E.2d 267 (1986) (interpreting Va. Code § 19.2-82). Malvo does not claim that he lost any exculpatory evidence as a result of the timing of his detention hearing. Therefore, the error, if any, is merely procedural and does not warrant suppression of his statements given in the interim.

In his brief in support of his motion to suppress, Malvo contended that the police orchestrated the events of November 7 with the intention of creating an opportunity to confront him when he was without counsel. *See generally Maine v. Moulton,* 474 U.S. 159 (1985). In his closing argument on the motion to suppress, Malvo backed away from that contention. Instead, he argues that the period of time during which he was unrepresented was simply

---

[2] See Commitment Order of November 7, 2002, in Malvo's juvenile file by which Malvo was committed "11/7/02 per Chief Judge Charles J. Maxfield."

the "result" of the dropping of the federal charges and his delivery to Virginia to face state charges. He maintains that the police nevertheless took unfair advantage of the situation when they interrogated him.

Certainly, the events of November 7 and the rapidity with which they transpired created a difficult situation for Malvo's Maryland attorneys and for Petit. They did everything they could to see to it that Malvo did not talk to the police without counsel or a guardian present. Yet, as events unfolded, the police were able to question Malvo before his Sixth Amendment right to counsel attached with regard to the Fairfax charges. There is no evidence that Fairfax police or prosecutors colluded with federal authorities to spirit Malvo away to Virginia without the knowledge of his Maryland attorneys with the hopes or intention of interrogating him when he was without counsel or the right to counsel. Accordingly, the circumstances that arose on the afternoon of November 7 fall far short of the type of police misconduct condemned in *Maine v. Moulton*, 474 U.S. 159 (1985). In that case, the police knowingly exploited an opportunity to confront the accused whose Sixth Amendment right to counsel had attached and questioned him without his counsel's knowledge.

The facts of this case are more akin to the case of *Moran v. Burbine*, 475 U.S. 412 (1986). In *Burbine,* the accused was being held by police in Cranston, Rhode Island, on a breaking and entering charge. Police from Providence wanted to question him about an unrelated murder. Burbine's Sixth Amendment right to counsel had not attached with regard to the murder charge, which was still in the investigatory stages. Burbine's family contacted a public defender to represent him on the breaking and entering charge. The attorney telephoned the Cranston police and told them that she represented Burbine and that she did not want him questioned without her being present. The police assured her that they would not question Burbine until the next day. The police did not tell the attorney that Providence police were en route to Cranston to question Burbine about a murder. Similarly, the police did not tell Burbine that an attorney was trying to contact him. Less than an hour later, police from Providence arrived at the Cranston police station and began questioning Burbine about the murder. After receiving his *Miranda* warnings, Burbine confessed. The Supreme Court held that the confession was admissible in Burbine's murder trial.

> We [do not] believe that the level of the police's culpability in failing to inform respondent of the telephone call [from his attorney] has any bearing on the validity of the waivers. In light of the state-court findings that there was no "conspiracy or collusion" on the part of the

police, we have serious doubts about whether the Court of Appeals was free to conclude that their conduct constituted "deliberate or reckless irresponsibility." But whether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights. ... Nor was the failure to inform respondent of the telephone call the kind of "trickery" that can vitiate the validity of a waiver. Granting that the "deliberate or reckless" withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. Because respondent's voluntary decision to speak was made with full awareness and comprehension of all the information *Miranda* requires the police to convey, the waivers were valid.

*Moran v. Burbine*, 475 U.S. 412, 423-24 (1986) (internal citations omitted). In that case, the police's poor treatment of Burbine's attorney did not require the suppression of his statement. "Clearly, a rule that focuses on how the police treat an attorney, conduct that has no relevance at all to the degree of compulsion experienced by the defendant during interrogation, would ignore both *Miranda*'s mission and its only source of legitimacy." *Id.* at 425.

There was a brief period of time after Malvo was in the custody of the Fairfax police but before his Sixth Amendment right to counsel attached. The police took full advantage of this situation and questioned Malvo extensively after fully advising him of his rights and after he waived his *Miranda* rights. Malvo maintains that this was unfair to him. The short answer to Malvo's argument on this point is that the police are not required to refrain from exploiting opportunities to interview suspects so long as in so doing they do not violate any of the suspect's constitutional rights. *McNeil v. Wisconsin*, 501 U.S. 171, 181 (1991); *Moran v. Burbine*, 475 U.S. 412, 426 (1986).

## B. *Fifth Amendment*

Malvo moves to have his statements suppressed because his right to counsel as guaranteed by the Fifth Amendment was violated.

In *Edwards v. Arizona*, 451 U.S. 477 (1981), the United States Supreme Court held that a suspect who invokes his Fifth Amendment right to counsel may not thereafter be questioned by the police unless he initiates the questioning. The *Edwards* rule is not offense specific. "Once a suspect invokes the *Miranda* right to counsel for interrogation regarding an offense, he

may not be reapproached regarding *any* offense unless counsel is present." *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991) (emphasis in original), *citing Arizona v. Roberson*, 486 U.S. 675 (1988).

Malvo asserts that he invoked his Fifth Amendment right to counsel throughout the federal criminal proceedings against him in Maryland. In addition, Tucker invoked his Fifth Amendment right to counsel for him in the letter he sent to the United States Attorney for the Eastern District of Virginia on November 7.

The Commonwealth responds that Malvo never invoked his Fifth Amendment right to counsel in the federal proceedings in Maryland. Indeed, the evidence adduced at the suppression hearing was that Malvo stood mute at every court proceeding in Maryland. Com. Ex. # 3 and # 4. Joshua Treem, one of Malvo's attorneys in Maryland, explained that Malvo did not say anything at all at his court appearances because his attorneys had advised him not to. Treem said that federal prosecutors were at that time trying to obtain an exemplar of Malvo's voice to compare it to some of the telephone calls made to the hotline set up to receive citizen tips about the sniper shootings. Because the federal court had audio recording capabilities, Malvo was instructed to say nothing.

*McNeil v. Wisconsin*, 501 U.S. 171 (1991), is instructive in resolving this issue. In that case, the United States Supreme Court held that a defendant who appeared in court at his arraignment with court-appointed counsel had not invoked his Fifth Amendment right to counsel. Therefore, the police could permissibly approach him and initiate questioning of him about unrelated offenses. McNeil was arrested and charged with robbery. After being advised of his *Miranda* rights, McNeil invoked his right to remain silent, but did not request an attorney. At his initial court appearance on the robbery charge, a public defender was appointed to represent McNeil. Later that day, police approached McNeil to ask about a murder and other crimes unrelated to the robbery charge. McNeil was given his *Miranda* rights and denied involvement in the murder. Over the next four days, McNeil was approached twice by the police to discuss the murder. In each instance, McNeil was given his *Miranda* warnings and confessed his involvement in the murder. The Supreme Court held the police interrogations of McNeil about the murder did not violate his Fifth Amendment right to counsel because McNeil never invoked his Fifth Amendment right to counsel. The *Edwards* rule "applies only when the suspect 'has *expressed*' his wish for the particular sort of lawyerly assistance that is the subject of *Miranda.*" *Id.* at 178 (emphasis in original). In that case, although McNeil's Sixth Amendment right to counsel had attached with regard to the robbery charge, McNeil never invoked his Fifth Amendment

right to counsel. Therefore, the police were free to question him about the unrelated murder charge.

*McNeil* makes clear the differences between the Sixth Amendment right to counsel and the Fifth Amendment or *Miranda* right to counsel. The Sixth Amendment right to counsel is offense specific and attaches upon the initiation of adversary criminal judicial proceedings against the accused, regardless of whether the accused affirmatively requests counsel. Once the Sixth Amendment right to counsel attaches "and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective." *Id.* at 175. The police may not approach an accused whose Sixth Amendment right to counsel has attached in an attempt to question him about that offense, although the police may question him about different offenses as to which "adversary judicial criminal proceedings" have not commenced. The *Miranda* Fifth Amendment right to counsel is not offense specific. Once the *Miranda* Fifth Amendment right to counsel attaches, the suspect who remains in continuous custody may not be approached to discuss any offense without counsel present. The Fifth Amendment right to counsel only arises if the accused expresses a desire for the assistance of counsel during a custodial investigation.

In this case, there is no evidence that Malvo ever invoked the Fifth Amendment right to counsel. Like McNeil, Malvo made clear while he was in Maryland his desire to remain silent. But Malvo never "*expressed* his wish for the particular sort of lawyerly assistance that is the subject of *Miranda.*" *McNeil*, 501 U.S. at 178. That Malvo was represented by counsel at his federal court appearances in Maryland for separate charges was not sufficient to invoke his Fifth Amendment right to counsel with regards to the charges in Virginia arising from the shooting of Linda Franklin. In fact, the United States Supreme Court in *McNeil* rejected the efficacy of any attempt by counsel at a preliminary hearing to anticipatorily invoke his client's *Miranda* rights. *Id.* at 182, n. 3.

Malvo maintains that he invoked his Fifth Amendment right to counsel on November 7 when he asked Boyle and Garrett "Do I get to see my attorneys?" For the same reasons discussed above, I find that Malvo's question was not a clear and unambiguous invocation of his right to counsel, under either the Fifth or Sixth Amendments.

Therefore, I conclude that the interrogation of Malvo on November 7 did not violate his Fifth Amendment right to counsel and need not be suppressed for that reason.

Malvo objects to the admission of his statement because, he alleges, it was obtained in violation of his Fifth Amendment right to remain silent.

If a suspect "indicates in any manner, at any time prior to or during the questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966). Malvo contends that he invoked his right to remain silent on several occasions while in federal custody in Maryland. Therefore, he argues, the police in Fairfax could not initiate questioning of him.

The Commonwealth relies on *Michigan v. Mosely*, 423 U.S. 96 (1975). In that case the United States Supreme Court held that police may re-approach a suspect who has invoked his right to remain silent. In that case, Mosely was in custody on two robbery charges. After receiving the *Miranda* warnings, he invoked his right to remain silent. The police "scrupulously honored" his request and stopped questioning him about the robberies. Two hours later, a second officer approached Mosely, re-advised him of his *Miranda* rights, and questioned him about an unrelated murder. The Supreme Court held that Mosely's Fifth Amendment right to remain silent was not violated and his confession to the murder made during the second interrogation was admissible.

In this case, I will assume that Malvo invoked his right to remain silent when he was in custody in Maryland. When Montgomery County police questioned him on October 24, he nodded his head from side to side, signaling that he did not want to talk to the police. Def. Ex. # 24. Malvo's last court appearance in Maryland was on October 29. At that time, he stood silently and did not respond to any questions put to him by Magistrate Judge Bredar.

Nevertheless, the fact that Malvo invoked his right to remain silent did not bar the police from ever again initiating questioning. When Boyle and Garrett initiated questioning of Malvo on November 7, a significant period of time had elapsed since Malvo was last advised of his *Miranda* rights and elected to remain silent. The police advised him again of his *Miranda* rights. The offenses in Fairfax were different from the charges that he faced in the Maryland federal court. After receiving a full explanation of his rights, Malvo elected to be interviewed by the police.

I conclude that Boyle and Garrett did not violate Malvo's Fifth Amendment right to remain silent and his statement need not be suppressed on that basis.

Malvo argues that his statements to Boyle and Garrett made on November 7 while they were waiting for the food to arrive, and before his *Miranda* warnings were given, should be suppressed. He claims that the police questions during this time went far beyond permissible booking information and ventured into questions designed to elicit incriminating information.

42

The Commonwealth responds that only "small talk" was exchanged while the veggie burgers were being secured and that "no reasonable observer could have viewed the officer's words or actions as designed to elicit an incriminating response."

In *Pennsylvania v. Muniz*, 496 U.S. 582 (1990), the United States Supreme Court found that answers to biographical questions asked during booking fall within a "routine booking question" exception to *Miranda*. Under that exception, *Miranda* warnings need not precede questions intended to elicit the "biographical data necessary to complete booking or pretrial services." *Id.* at 601. "Recognizing a 'booking exception' to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." *Id.* at 602, n. 14.

I agree with Malvo that the *Miranda* warnings should have been given earlier in the interview. Some of the questions asked during the period before the *Miranda* warnings were given elicited potentially incriminating information. For example, Malvo was asked how he got around the area, how he met Muhammad, if he thought one has the right to harm other people, and if he would harm other people. He was asked: "Why are we here?" "Would you do it over again?" and "Do you think there is a way out of this?" Def. Ex. # 23. These questions go beyond permissible booking questions. I conclude that Malvo's statements made before the *Miranda* warnings were given should be suppressed.

Malvo next argues that, if the pre-Miranda portion of the interview is suppressed, the entire interview should be suppressed as the "fruit of the poisonous tree." The case of *Oregon v. Elstad*, 470 U.S. 298 (1985), resolves this issue. Elstad was arrested on a burglary charge. Without advising Elstad of his *Miranda* rights, the police questioned him about the burglary and Elstad confessed. Later, after *Miranda* warnings were given, Elstad confessed a second time. The United States Supreme Court held that the second statement was admissible:

> We conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded the admission of the earlier statement.

*Id.* at 314. The *Elstad* court specifically refused to import the "fruit of the poisonous tree" analysis from Fourth Amendment jurisprudence into Fifth Amendment analysis of *Miranda* violations:

> We find that the dictates of *Miranda* and the goals of the Fifth Amendment proscription against the use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing "taint" to the subsequent statements obtained pursuant to a voluntary and knowing waiver. We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.

*Id.* at 318.

*Elstad* is directly applicable to this case. No statement of Malvo's was coerced before the *Miranda* warnings were given. While that portion of the interrogation is not admissible in the Commonwealth's case in chief, the remainder of the interrogation is not thereby tainted. The administration of the *Miranda* warnings and Malvo's subsequent wavier of his *Miranda* rights cured any concerns about the admissibility of his statements made thereafter.

C. *Due Process*

Malvo claims that his statement was not voluntary, and, therefore, its admission into evidence at his trial will violate his right to Due Process guaranteed by the Fifth Amendment.

In determining the voluntariness of a statement, I must consider the "totality of the circumstances."

> The "totality of the circumstances" approach permits — indeed, it mandates — inquiry into all of the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the [*Miranda*] warnings given him, the nature of the Fifth Amendment rights, and the consequences of waiving those rights.

*Grogg v. Commonwealth*, 6 Va. App. 598, 612, 371 S.E.2d 549 (1988). The test of voluntariness is whether the accused's statement is the product of an essentially free and unconstrained choice by its maker or whether the maker's

will has been overborne and his capacity for self determination critically impaired. *Schneckcloth v. Bustamonte*, 412 U.S. 218 (1973); *Midkiff v. Commonwealth*, 250 Va. 262, 462 S.E.2d 112 (1995).

I have considered the totality of the circumstances in determining whether Malvo's statement was voluntary. Among other matters, I have considered the following circumstances shown by the evidence at the suppression hearing. Malvo was at the time of the police interrogation seventeen years and nine months old. He had prior experience with the criminal justice system during which time his *Miranda* rights were explained to him. He had exercised his right to remain silent when he was in Maryland. He never expressly invoked his right to counsel. He has approximately a twelfth grade education. He reads for pleasure. He was not under the influence of any drugs or alcohol. His physical needs were met during the interrogation. He was fed a dinner of his choosing. After the meal arrived, he was not handcuffed. The police did not threaten him in any way. They did not make any appeals to his emotions. He asked whether he had the right to talk to his attorneys, and he was told that he did. He related that his Maryland attorneys told him not to talk to the police. He said he understood his *Miranda* rights as they were explained to him. He signed a waiver and consent form with an "X" indicating that he knew what his rights were and he waived those rights and chose to speak to the police. He understood the seriousness of the charges against him. He knew he was being charged with homicide. The interrogation lasted from about 5:55 p.m. to 10:45 p.m. He was in a small interrogation room in the Massey Building. The police did not appear to use any deception or trickery to encourage him to talk. He did not have the assistance of a parent, guardian, or independent interested adult. He was told at least four times that he had the right to have an attorney present with him during the questioning. He did not ask for an attorney. He was not upset or crying. He was calm. At some points, he laughed when describing some of the shootings. He was given the opportunity to stop the interview, but he chose to continue.

Having considered the totality of the circumstances surrounding the police interrogation of Malvo on November 7, I conclude that his statement was made voluntarily. Accordingly, the admission of the statement in Malvo's trial will not violate his Due Process rights.

## D. *Vienna Convention*

Malvo claims that his rights under the Vienna Convention were violated and that his statements made to Boyle and Garrett on November 7 should be suppressed for that reason.

Under the Vienna Convention on Consular Relations, a foreign national detained in another signatory state has the right to have his consulate advised that he is being detained. In addition, the foreign national shall be informed "without delay" of his right to have the consulate contacted. 21 U.S.T. 77, T.I.A.S. No. 6820.

In his brief in support of his motion to suppress, Malvo contends that he was "*never* informed of his rights" under the Vienna Convention. (Emphasis in original.)

The evidence adduced at the hearing on the motion to suppress shows that Malvo was advised of his rights under the Vienna Convention. At his first court appearance in Maryland on October 24 Malvo was advised of his right to have Jamaican consular officials notified of his arrest and detention. In fact, the Jamaican embassy had been notified of Malvo's detention prior to the hearing. Com. Ex. # 3 at pp. 37-39. At Malvo's second court appearance in Maryland on October 29, an official from the Jamaican consulate was present "right outside the courtroom." Com. Ex. # 4 at p. 18. Finally, Boyle's testimony is undisputed that she informed Malvo of his right to have the embassy contacted.

Malvo now contends that his rights under the Vienna Convention were violated when Boyle did not advise him of his right to have the Jamaican consulate contacted until midway through the interrogation, rather than at the outset.

There is no requirement in the Vienna Convention that the detained foreign national be notified of his right to consular access before he is advised of his *Miranda* rights and is questioned. *Bell v. Commonwealth*, 264 Va. 172, 187, 563 S.E.2d 695 (2002).

I conclude that the Vienna Convention on Consular Relations was fully complied with in this case. Even if there were a violation, the treaty creates no individually enforceable legal rights and suppression of any statement made by the foreign national is not required. *Bell v. Commonwealth*, 264 Va. 172, 563 S.E.2d 695 (2002); *Shackleford v. Commonwealth*, 262 Va. 196, 547 S.E.2d 899 (2001); *Kasi v. Commonwealth*, 256 Va. 407, 508 S.E.2d 57 (1998), *cert. denied*, 527 U.S. 1038 (1999).

## Conclusion

For the foregoing reasons, the defendant's motion to suppress will be granted to the extent it relates to that portion of the defendant's interrogation on November 7, 2002, that occurred before the *Miranda* warnings were given. The defendant's motion to suppress will be denied to the extent it relates to that portion of the interrogation that occurred after the *Miranda* warnings were

given and the defendant waived his rights and agreed to talk to the police. An order reflecting the rulings contained in this letter has been entered this day.

*Order*

On April 29, 2003, Robert F. Horan, Jr., the Commonwealth's Attorney, Raymond Morrogh, Deputy Commonwealth's Attorney, Lee Boyd Malvo, a/k/a John Lee Malvo, the Defendant, Michael S. Arif, Craig S. Cooley, Mark Petrovich, and Thomas Walsh, Counsel for the Defendant, appeared before this Court. The Defendant is indicted for the felonies of capital murder (2 counts) and using a firearm in the commission of a felony and he appeared while in custody.

The defendant's Motion to Suppress came on for a hearing on April 28 and 29, 2003. At the conclusion of the hearing, the court took the motion under advisement.

For the reasons stated in the court's opinion letter dated May 6, 2003, a copy of which is attached hereto and incorporated herein, the Motion to Suppress is granted in part and denied in part.

The Motion to Suppress is granted as to that part of the defendant's statement given on November 7, 2002, before he was given *Miranda* warnings. The Motion to Suppress is denied as to that part of the defendant's statement given on November 7, 2002, after the *Miranda* warnings were given and he executed the waiver and consent form.