Certiorari dismissed, November 17, 2008

**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

No. 06-22

———————

EDWARD NATHANIEL BELL,

Petitioner - Appellant,

versus

LORETTA K. KELLY, Warden, Sussex I State
Prison,

Respondent - Appellee.

———————

Appeal from the United States District Court for the Western
District of Virginia, at Roanoke. James P. Jones, Chief District
Judge. (7:04-cv-00752-jpj)

———————

Argued: October 30, 2007          Decided: January 4, 2008

———————

Before NIEMEYER, SHEDD, and DUNCAN, Circuit Judges.

———————

Affirmed by unpublished opinion. Judge Shedd wrote the opinion, in
which Judge Niemeyer and Judge Duncan joined.

———————

**ARGUED:** Matthew K. Roskoski, LATHAM & WATKINS, L.L.P., Washington,
D.C., for Appellant. Katherine P. Baldwin, Senior Assistant
Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond,
Virginia, for Appellee. **ON BRIEF:** Katharine R. Saunders, LATHAM &
WATKINS, L.L.P., Washington, D.C.; Robert Lee, VIRGINIA CAPITAL
REPRESENTATION RESOURCE CENTER, Charlottesville, Virginia; James G.
Connell, III, Jonathan P. Sheldon, Randi R. Vickers, DEVINE,
CONNELL & SHELDON, P.L.C., Fairfax, Virginia, for Appellant.
Robert F. McDonnell, Attorney General, Jerry P. Slonaker, Senior

Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

SHEDD, Circuit Judge:

A Virginia jury convicted Edward N. Bell of murdering Winchester police sergeant Ricky L. Timbrook, and he was sentenced to death. After unsuccessfully appealing his conviction and sentence in state court on direct review and in state habeas proceedings, Bell filed a petition in federal district court for a writ of habeas corpus. See 28 U.S.C. § 2254(d). The district court dismissed Bell's petition, and he now appeals, arguing that the district court erred in concluding that the dismissal by the state court of his ineffective assistance of counsel claim was reasonable. We affirm.

I.

In affirming Bell's conviction and sentence on direct appeal, the Supreme Court of Virginia found the following facts:

"On the evening of October 29, 1999, Sergeant Timbrook and two probation and parole officers were working together in a program known as Community Oriented Probation and Parole Services. One aspect of Sergeant Timbrook's responsibilities was to assist the probation officers in making home visits to individuals on probation or parole. On that particular evening, these three individuals were patrolling in an unmarked car in Winchester and were, among other things, searching for Gerrad Wiley, who was wanted for violating the terms of his probation.

3

"The officers went to Wiley's residence on Woodstock Lane in Winchester several times that evening to no avail. Just before midnight, when they returned to Wiley's residence for the sixth time, they saw an individual standing in a grassy area between a trash dumpster and an apartment building. As one of the probation officers and Sergeant Timbrook exited the vehicle and approached that individual, who was later identified as Daniel Charles Spitler, another person, who had 'dipped behind in the shadows,' began running away. Sergeant Timbrook pursued that individual while calling for assistance on his radio.

"Spitler identified the individual who ran from Sergeant Timbrook as Bell. Spitler testified that, on the evening in question, he was in the area of Woodstock Lane for the purpose of obtaining cocaine from Wiley. After no one answered his knock on the door of Wiley's residence, Spitler started walking down a nearby alley where he encountered Bell. Spitler did not tell Bell that he wanted cocaine, but, according to Spitler, Bell 'put his hands on [Spitler] like to pat [him] down to check and see if [Spitler] had a wire on [him].' During that encounter, Sergeant Timbrook and the two probation officers arrived in the unmarked vehicle.

"When the vehicle's headlights illuminated Spitler and Bell, Spitler started walking toward the headlights, but Bell stepped into the shadows of a building. Spitler identified Sergeant

4

Timbrook as one of the individuals who emerged from the vehicle. According to Spitler, Bell then started running away and Sergeant Timbrook chased after him, yelling 'We have one running. Stop.' Spitler lost sight of Bell and Sergeant Timbrook when they ran behind a building, but Spitler testified that he heard a shot soon thereafter.

"Sergeant Timbrook chased Bell along several streets and down an alley between two houses located at 301 and 303 Piccadilly Street. These houses were separated by a fence approximately two or three feet in height. As Sergeant Timbrook started to climb over the fence, a shot rang out. A police officer, Robert L. Bower, who had responded to Sergeant Timbrook's radio call for assistance, described the incident in this manner:

> [A]s [Sergeant Timbrook] started to cross over, I took my eyes off of him, and directed it toward the subject. I noticed it stopped. And, I saw a, what appeared to be a left shoulder as it stopped. All I could was ... it was like a black material.... As soon as I saw it stop, I looked back at [Sergeant] Timbrook to say something, at which time I heard the shot. And, I saw [Sergeant] Timbrook falling.

"Sergeant Timbrook's body was found lying on the ground with his feet close to the fence and his upper torso leaning against a wall. His gun was still in its holster. Sergeant Timbrook was transported to a local hospital where he was pronounced dead. The cause of death was a single gunshot wound above his right eye,

5

caused by a bullet which was fired from a distance of between six and eighteen inches.

"Brad Triplett, one of the probation officers who had been patrolling with Sergeant Timbrook that evening, ran in a parallel direction during part of Sergeant Timbrook's pursuit of Bell. At one street intersection, he saw Sergeant Timbrook running after the 'same dark[ly] dressed figure' who had originally fled from Sergeant Timbrook. Triplett described that person's clothing as a 'dark black type of jumpsuit, nylon material,' with 'reflective like stripes on the jacket.' Several times during the pursuit, Triplett heard Sergeant Timbrook yelling, 'Stop running. Police.' He also heard the gunshot.

"The police searched the area for the suspect throughout the night by securing a perimeter around the neighborhood where the shooting had occurred and by using a helicopter equipped with a heat-sensitive 'Forward Looking Infrared' camera and a spotlight. At one point during the search, Officer Brian King spotted an individual lying on the back steps of a house located at 305 Piccadilly Street. King stated that the person was wearing a dark colored jacket with reflective strips on the sleeves that 'li[t] up like a Christmas [t]ree' when he shined his flashlight on the individual. The person then stood up and disappeared behind a bush.

"Emily Marlene Williams, who lived at 305 Piccadilly Street, testified that she heard the gunshot on the evening in question and about five minutes later heard a 'crash' in the basement of her house. After she told the police about the noise in her basement, the police evacuated her and her family from their home. The following morning, the police discovered Bell, a Jamaican national, hiding in a coal bin in the basement of the Williams' residence. He was wearing a 'LUGZ' black nylon jacket and a black beret cap with a gold pin. The jacket had reflective stripes on the sleeves. Spitler identified both of these items of clothing as those that Bell had been wearing on the evening when Sergeant Timbrook was shot. Before Bell was transported from the Williams' residence to the police department, a gunshot residue test was administered to Bell's hands and the recovered particles were subsequently identified as gunshot primer residue.

"During a search of the backyard of the Williams' residence the day after Bell was apprehended, a deputy sheriff found a pearl-handled, Smith and Wesson .38 Special double action revolver. The gun was located under the edge of a porch on the Williams' house and was covered with leaves and twigs. Forensic testing established that this handgun fired the bullet that killed Sergeant Timbrook. Forensic testing of DNA that was recovered by swabbing the grips, butt, trigger, and trigger guard of this revolver could

7

not eliminate Bell as a co-contributor of that DNA, which was consistent with a mixture of DNA from at least three individuals.

"When questioned by the police after his arrest, Bell admitted that he had been on Woodstock Lane when 'a white guy' allegedly began bothering him for information.  Bell said that when a car drove up and a man got out of the car, he 'was scared' and ran.  He said he did not know who was chasing him or why, and that when he heard a shot fired, he hid in the basement of the house where he was later discovered.  Bell denied having a gun. However, while Bell was confined in jail awaiting trial, he told another inmate that he shot Sergeant Timbrook, threw the gun underneath a porch, and then broke into a house and changed clothes in the basement.

"Justin William Jones testified that, around nine o'clock on the evening of the shooting, he saw Bell in the vicinity of Piccadilly Street.  According to Jones, Bell showed him a revolver and asked if Jones knew of anyone who wanted to buy a weapon. Jones identified the pearl-handled, .38 caliber revolver introduced at trial as the same weapon that Bell had shown him.

"The evening Sergeant Timbrook was shot was not the first encounter between Timbrook and Bell.  Sergeant Timbrook had arrested Bell for carrying a concealed weapon in May 1997.  The following year, in September 1998, Sergeant Timbrook was present during the execution of an Immigration and Naturalization Service order to detain Bell.  Eight months later, Sergeant Timbrook

8

assisted in executing a search warrant at Bell's home. Bell was present during that search. In the summer of 1999, one of Bell's friends heard Bell state, as Sergeant Timbrook drove by in a vehicle, 'Somebody needs to bust a cap in his ass.' Another of Bell's acquaintances testified that she heard Bell say that he would like to see Sergeant Timbrook dead, and that if he ever came face to face with Sergeant Timbrook, he would shoot Sergeant Timbrook in the head because he knew that Sergeant Timbrook wore a bullet-proof vest.

"During the penalty phase, the Commonwealth presented evidence regarding Bell's criminal history. Several law enforcement officers testified about incidents involving Bell. A police officer from Jamaica provided information about Bell's commission of the crimes of assault and destruction of property in 1985. In 1997, an officer with the Winchester Police Department found a .38 caliber handgun concealed in the trunk of a car being driven by Bell. The serial number of the gun had been filed off. An officer with the West Virginia State Police stated that when he stopped Bell for speeding in 1999, Bell gave him a false name. When the officer started to arrest Bell and place him in handcuffs, Bell ran away into a cornfield. Another West Virginia law enforcement officer found five .38 caliber rounds of ammunition on Bell's person during a 'stop and frisk' in 1999. Finally, two employees

9

of the jail where Bell was confined while awaiting trial testified that Bell had threatened them.

"Another witness, Billy Jo Swartz, testified about an incident in 1997 when Bell grabbed her head and slammed it into his car. He also held a gun to her head. During the same incident, Bell got into a fight with his pregnant girlfriend and knocked her to the ground. Swartz further stated that she had seen Bell with illegal drugs. Other witnesses likewise testified about buying illegal drugs from Bell.

"Members of Sergeant Timbrook's family described their relationship with him and the effect that his death has had on the family. His wife was pregnant with their first child when Sergeant Timbrook was killed. The only evidence that Bell introduced during the penalty phase was from his sister and father." Bell v. Commonwealth, 563 S.E.2d 695, 701-703 (Va. 2002), cert. denied, 537 U.S. 1123 (2003)(alterations in original)(footnote omitted).

II.

A grand jury in Winchester, Virginia, indicted Bell for capital murder, alleging that he deliberately, willfully, and with premeditation killed a police officer for the purpose of interfering with the performance of the officer's official duties. See Va. Code Ann. § 18.2-31(6). The jury found Bell guilty and he

10

was sentenced to death based on the probability that he would commit criminal acts of violence in the future that would constitute a continuing serious threat to society. See Va. Code Ann. § 19.2-264.2. The Supreme Court of Virginia affirmed his conviction and sentence and denied his petition for rehearing. The United States Supreme Court subsequently denied his writ of certiorari. Bell thereafter filed a state petition for writ of habeas corpus asserting 21 claims, all of which the Supreme Court of Virginia dismissed in a 31-page opinion.

In the portion of the opinion denying Bell's claim that he received ineffective assistance of counsel, the Supreme Court of Virginia stated the following:

> The Court holds that claim (III)(a) satisfies neither the 'performance' nor the 'prejudice' prong of the two-part test enunciated in Strickland. The record, including the affidavit of counsel, demonstrates that after interviewing petitioner, his sisters and his mother, counsel believed that there was little mitigation evidence available to assist petitioner. However, the transcript of the sentencing hearing establishes that counsel introduced evidence of petitioner's background and family life and such evidence was heard by the jury through petitioner's sister and father. Petitioner's sister testified that petitioner was one of fourteen children and that, except for one speeding incident in which she was involved after petitioner's arrest, no member of the family ever had legal problems. Petitioner's father testified that he started traveling to the United States in 1966 to do agricultural work and that, except for speeding violations; he also never had any legal troubles. While counsel did not introduce evidence of petitioner's drug and alcohol use, evidence that both petitioner's parents had multiple children with different partners, or evidence that petitioner supported five children borne of three different women, counsel is

11

not ineffective for failing to present evidence that could be 'cross-purpose evidence' capable of aggravation and mitigation. Petitioner fails to proffer additional information that counsel should have discovered or presented during the penalty phase of petitioner's trial that would have assisted in mitigating his offense of capital murder. For example, there is not sufficient evidence in the record from a psychologist or a psychiatrist to show that petitioner's background and family life had an effect upon his development. Thus, petitioner has failed to demonstrate how counsel's performance was unreasonable or that there is a reasonable probability that, but for counsel's alleged failure to investigate and present the alleged available mitigation evidence, the result of the proceeding would have been different. In finding no prejudice, the Court has weighed the evidence in aggravation against the mitigation evidence presented at the penalty phase of the trial and on habeas.

Bell v. True, No. 030539, slip op. at 8-9 (Va. April 29, 2004)(citations omitted).

The Supreme Court of Virginia denied Bell's motion for rehearing and his motion to amend his habeas petition. Bell then filed a federal habeas petition. The district court denied all of Bell's grounds for relief without a hearing, except for his claim that his trial counsel's failure to investigate or present mitigating evidence constituted ineffective assistance of counsel.

On this claim, the district court granted an evidentiary hearing on Bell's allegation that the decision of the Supreme Court of Virginia was an unreasonable determination of the facts in light of the evidence before it and an unreasonable application of

12

precedent of the Supreme Court of the United States.[1]  See §
2254(d).  After its evidentiary hearing, the district court found
that Bell received deficient performance from counsel and that the
decision of the Supreme Court of Virginia to the contrary was
unreasonable.  See Wiggins v. Smith,  539 U.S. 510, 521 (2003).
However, the district court also found that the decision of the
Supreme Court of Virginia that counsel's performance did not
prejudice Bell was reasonable.[2]  See Strickland v. Washington, 466
U.S. 668, 694 (1984).  The district court granted a certificate of
appealability on the issue of whether counsel's investigation and
presentation of mitigation evidence constituted ineffective
assistance of counsel.  This appeal followed.


III.

We review a district court's decision to grant or deny habeas
relief de novo.  See Williams v. Ozmint, 494 F.3d 478, 483 (4th

---

[1]The district court granted Bell an evidentiary hearing
because it appeared to the district court that the fact-finding
procedure employed by the state court was not adequate to afford a
full and fair hearing.  See Townsend v. Sain, 372 U.S. 293, 313
(1963).  Because we find that counsel's performance did not
prejudice Bell, we need not decide whether the district court
correctly granted an evidentiary hearing.

[2]The district court's written order granting an evidentiary
hearing noted the deferential standard of review required by §
2254(d).  J.A. 752-53.  Although the district court's oral order
dismissing Bell's petition did not explicitly apply this standard
of review, we read the district court's oral order as consonant
with its written order.

13

Cir. 2007). A federal court may not grant habeas relief unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See 28 U.S.C. § 2254(d)(1)&(2). Under this standard, the federal court determines not whether "the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold." Schriro v. Landrigan, 127 S. Ct. 1933, 1939, (2007)(citations omitted).

Bell claims that he received ineffective assistance of counsel and that the findings of the Supreme Court of Virginia to the contrary were unreasonable. To prevail on a claim of ineffective assistance of counsel, Bell must demonstrate (1) deficient performance, meaning that "counsel's representation fell below an objective standard of reasonableness" in light of "prevailing professional norms;" and (2) prejudice, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694.

On performance, Bell claims that counsel was deficient for failing to investigate and present available mitigating evidence from his ex-girlfriend, ex-wife, ex-wife's sister, ex-girlfriend's

14

mother, and a co-worker.[3]  See Wiggins, 539 U.S. at 522.  He further claims that if counsel had presented such evidence, there is a reasonable probability that he would have received a life sentence.  Id. at 534.  Finally, Bell argues that the findings of the Supreme Court of Virginia to the contrary were unreasonable.  See § 2254(d).  We conclude that the district court correctly found that the finding of the Supreme Court of Virginia on prejudice was reasonable, and therefore Bell is not entitled to relief on his claim of ineffective assistance of counsel.  Under these circumstances, it is unnecessary for us to address the district court's conclusion that the finding of the Supreme Court of Virginia that Bell did not receive deficient performance was unreasonable.  See Strickland, 466 U.S. at 697-98.

In concluding that counsel's performance did not prejudice Bell, the Supreme Court of Virginia found that the evidence from Bell's witnesses constituted cross-purpose evidence, which is evidence capable of both aggravation and mitigation.  See Barnes v. Thompson, 58 F.3d 971, 980 (4th Cir. 1995)(citations omitted).  In making its prejudice determination, the Supreme Court of Virginia

---

[3]Bell also claims that the district court should have allowed him to present a report of witnesses from Jamaica, and should have appointed him two mental health experts.  Ordinarily, we would review such rulings for abuse of discretion.  See United States v. Forrest, 429 F.3d 73, 79 (4th Cir. 2005).  However, since a certificate of appealability was never granted on these issues, we do not have jurisdiction to consider them.  See Reid v. True, 349 F.3d 788, 795-98 (4th Cir. 2003).

15

weighed this cross-purpose mitigation evidence against the evidence in aggravation.  See Wiggins, 539 U.S. at 534.

At the district court's evidentiary hearing, Bell presented testimony from the five witnesses he claims should have testified for him during the penalty phase of the trial.  After reviewing testimony from these witnesses, the district court concluded that the Supreme Court of Virginia was reasonable in finding that the absence of their testimony did not prejudice Bell because the evidence in aggravation outweighed the mitigation evidence presented at trial and on state and federal habeas.

In reviewing the district court's decision that the Supreme Court of Virginia was reasonable in finding no prejudice, we review the evidence that the district court found would have been the most beneficial to Bell had it been presented during the penalty phase of Bell's trial.  After its evidentiary hearing, the district court identified Dawn Jones, Barbara Bell Williams, Carol Baugh Anderson[4], and Joanne Nicholson as Bell's strongest witnesses.[5]

Ex-girlfriend Dawn Jones testified that Bell helped pay her bills when she was pregnant and was a good father to their child.

---

[4]This witness is referred to as Carol Baugh Williams in the district court's oral order.

[5]Bell also presented testimony from his coworker, Precious Henderson, but the district court considered her testimony less helpful because she was unaware that Bell had been terminated from his job for substance abuse.

16

However, Jones also testified that Bell physically assaulted her three or four times during their five-year relationship. While Jones was pregnant in 1993, Bell returned to Jamaica and married Barbara Williams, with whom he had previously fathered a child. Furthermore, after their relationship ended, Bell displayed a firearm during an argument with a man at Jones' house.[6] Finally, although Bell sent gifts to Jones, he never paid child support.

Ex-wife Barbara Williams testified that Bell was hard-working, loving, and a good father. However, she also testified that while she was pregnant in 1992, Bell left her and went to the United States. Bell never paid child support to Williams.

Prior to moving in with Williams, Bell lived in the same house with her sister, Carol Baugh Anderson, for approximately eighteen months.[7] Anderson testified to the district court that Bell was hard-working, helpful around the house, and non-violent. However, Anderson's testimony allowed the prosecution to question her on Bell's relationship with her sister.

Joanne Nicholson is grandmother to the three children Bell fathered with his ex-girlfriend, Tracy Nicholson. Joanne testified

---

[6]Jones is the only one of the five witnesses to testify during the penalty phase of the trial. She testified for the prosecution regarding Bell's display of a firearm during this incident.

[7]Carol Baugh Anderson testified to the district court that she and Bell lived in separate rooms and did not have a romantic relationship.

to the district court that Bell was a good father and that she never saw him hit Tracy. However, her testimony was undermined by police reports showing that Bell assaulted Tracy. Joanne also testified that she saw the incident with Billy Jo Schwartz and stated that Bell did not have a gun and did not hit Tracy. However, Schwartz testified that Joanne was not present when Bell held a gun to Schwartz's head. Additionally, Joanne's account of the incident conflicts with both Schwartz's testimony and Tracy's affidavit.[8] Finally, her testimony allowed the prosecution to emphasize that Bell gave gifts, but did not provide child support to Tracy.

After review, we conclude that the district court correctly concluded that the finding of the Supreme Court of Virginia on prejudice was reasonable. Evidence from each of these witnesses was cross-purpose because it would have allowed the prosecution to emphasize multiple instances of Bell's infidelity; abandonment of his children, wife and girlfriend; domestic abuse; and failure to provide child support. Furthermore, focusing on Bell's domestic relationships likely would have caused the jury to compare Bell unfavorably to Officer Timbrook, whose death left behind a pregnant wife. When weighed against the aggravating factors of Bell's criminal record and propensity for violence, we find it reasonable

---

[8]Both Tracy and Schwartz state that during the incident Tracy was on top of Bell's car while it was moving. Joanne denied that Tracy was ever on top of Bell's car.

18

for the Supreme Court of Virginia to conclude that the factors in aggravation outweighed the mitigation evidence.  Accordingly, we affirm the district court's decision denying Bell's petition for writ of habeas corpus.

AFFIRMED